Douglas J. Serdahely
PATTON BOGGS LLP
601 West Fifth Avenue, Suite 700
Anchorage, AK 99501
(907) 263-6300 Phone
(907) 263-6345 Fax

Attorneys for Defendant Exxon Shipping Company (D-2)

John F. Clough, III
P.O. Box 211187
Auke Bay, AK 99821
(907) 790-1912 Phone
(907) 790-1913 Fax

Attorneys for Defendant Exxon Mobil Corporation (D-1)

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| In re:<br>THE EXXON VALDEZ<br><br>THIS DOCUMENT RELATES TO<br>PLAINTIFFS COOK INLET PROCESSING, INC.,<br>NAUTILUS MARINE, INC.,<br>AND EXXON | Case No. 3:89-cv-00095-HRH |

**MEMORANDUM IN SUPPORT OF MOTION OF DEFENDANTS
EXXON MOBIL CORPORATION (D-1) AND EXXON SHIPPING COMPANY (D-2) IN
SUPPORT OF MOTION IN LIMINE TO PRECLUDE EVIDENCE
OF DAMAGES CAUSED BY SALMON PRICE DECLINES**

Twelve years after the Phase IIA jury determined that the oil spill did <u>not</u> cause a decline in salmon prices in the years after 1989, plaintiffs Cook Inlet Processing ("CIP"), and Nautilus Marine, Inc. ("NMI") (collectively, "the processors") wish to establish exactly the opposite. They contend that the spill caused price declines in all years from 1990 to 1993, and in all salmon species, ranging from 20% declines for sockeyes, cohos, and kings in 1990-91 to 5% for pinks and chum in 1993. Notably, the processors make no claim for 1989, the one year in which

50347v1

the jury found a price effect, since all the processors' claims for 1989 have been settled and resolved. The processors' total damage claims from the alleged price effect for 1990-93 amounts to $16,451,000.

The processors do not plan to present any expert or other scientific testimony in support of this enormous claim. The report of their damages expert bases their salmon damage claim solely on "the direct experience of management as represented to us" -- in other words, on what Messrs. Waterer and Shupe, the Presidents respectively of NMI and CIP, told them.[1]  Messrs. Waterer and Shupe, in turn, offer nothing but their own "experience" or "business judgment," and the fact that Japanese buyers of salmon supposedly told them that they could not pay as much for salmon because of the spill. Deposition of Thomas Waterer ("Waterer Depo.") at 255-56, 266; Deposition of Michael Shupe ("Shupe Depo.") taken on April 26, 2006 at 120:12-19; 122:2-12,125-27; Shupe Depo. taken on May 12, 2006 at 241-42.

This would be too thin to be presented to a jury even if there had been no trial and no verdict in 1994. A claim of price declines in a complicated, international market like the one for salmon needs expert testimony, not simply the say-so of interested plaintiffs. When the Consolidated Plaintiffs presented a similar case in 1994, they supported it with extensive expert

---

[1] Nautilus Marine, Inc. Damages Incurred as a Result of the 1989 Exxon Valdez Oil Spill, dated Sept. 21, 2005 ("NMI Report") at 21; Polar Equipment, Inc., d/b/a/ Cook Inlet Processing Damages Incurred as a Result of the 1989 Exxon Valdez Oil Spill, dated Oct. 12, 2005 ("CIP Report") at 21. Copies of the portions of the Damages Reports and deposition testimony quoted will be found attached as Exhibit A.

MEMORANDUM IN SUPPORT OF MOTION OF DEFENDANTS EXXON MOBIL CORPORATION (D-1) AND EXXON SHIPPING
COMPANY (D-2) IN SUPPORT OF MOTION IN LIMINE TO PRECLUDE EVIDENCE OF DAMAGES CAUSED BY
SALMON PRICE DECLINES
*IN RE THE EXXON VALDEZ*
CASE  NO. 3:89-cv-00095-HRH
PAGE 2

50347v1

testimony about the Japanese market, and a complicated economic model.  But even that was not good enough for the 1994 jury, which rejected all price claims for all years after 1989.

Testimony on the processors' salmon price claims, in other words, must be excluded for two independently sufficient reasons.  First, it is barred by the verdict of the 1994 jury, by reason both of the doctrine of law of the case and the doctrine of collateral estoppel.  The processors are bound by the earlier verdict, and they do not get a second bite at the same apple.

Second, evidence in support of the processors' salmon price claims must be excluded because claims of price effect are inherently beyond the knowledge or expertise of a lay jury, and must be supported, if at all, by expert testimony and opinions -- opinions which the processors do not offer.

I.     FACTUAL BACKGROUND

The Phase IIA trial was conducted to "establish proximate cause and damages" for "lost harvest, *price*, and permit valuation claims of salmon and herring fisheries in…five geographical areas," including Prince William Sound.  (Third Amended Revised Trial Plan, Clerk's Docket No. 4798, at pp.2-3 (emphasis added).)  The Court, counsel and forty-two witnesses invested almost two months in 1994 to resolve these issues.  The jury deliberated four weeks to decide them.  The spill's effect on price was among the central issues.  Plaintiffs' expert, Dr. Robert Mendelsohn, a professor of environmental studies at Yale, argued that, "[t]he Exxon Valdez spill damaged the reputation or damaged the image of high quality fish coming out of the Alaska seafood market, and this resulted in lower prices for those fish from 1989 through 1991."

MEMORANDUM IN SUPPORT OF MOTION OF DEFENDANTS EXXON MOBIL CORPORATION (D-1) AND EXXON SHIPPING
COMPANY (D-2) IN SUPPORT OF MOTION IN LIMINE TO PRECLUDE EVIDENCE OF DAMAGES CAUSED BY
SALMON PRICE DECLINES
*IN RE THE EXXON VALDEZ*
CASE  NO. 3:89-cv-00095-HRH
PAGE 3

50347v1

(30/5181.)[2]   In defense, Exxon offered the testimony of Dr. James Anderson, who testified that the spill had no effect on prices after 1989.  (37/6811.)

Although the jury awarded over $100 million to compensate for 1989 salmon price declines that it found the spill had caused (*see* Special Verdict for Phase II-A of Trial ("Special Verdict"), Clerk's Docket No. 5714, Interrogatory No. 17), it found that there were no such effects on Alaskan salmon prices in years after 1989.  Interrogatory Nos. 19 and 21 asked the jury explicitly whether "the oil spill was a legal cause of a decline in prices paid…for salmon of that species caught by plaintiffs," in 1990 and 1991.  *Id*.  The jury answered "no" to both questions, and awarded no damages.  *Id*.

Ignoring the Phase IIA verdict, the processors claim they were hurt because of spill-induced price declines in the same years that the Phase IIA jury said there were none.  Here is the evidence they present:

- Their damages expert, Lindon Greene of Business Advisory Services ("BAS") states that "our estimates of lost profits due to market price disruption are based on the direct experience of management, as represented to us."  CIP Report at 21; NMI Report at 21.  BAS and Greene expressly "do not rely on the implied impact from the Mendelsohn Salmon Report data.  We have instead relied on management's estimates of the percentage market price disruption."  NMI Report at 22; CIP Report at 23.  There is

---

[2] Attached for the Court's convenience as Exhibit B are copies of the pages cited from the 1994 trial transcript.  The trial transcript is cited by volume and page number as follows: 30/5181, referring to volume 30, page 5181.

MEMORANDUM IN SUPPORT OF MOTION OF DEFENDANTS EXXON MOBIL CORPORATION (D-1) AND EXXON SHIPPING
COMPANY (D-2) IN SUPPORT OF MOTION IN LIMINE TO PRECLUDE EVIDENCE OF DAMAGES CAUSED BY
SALMON PRICE DECLINES
*IN RE THE EXXON VALDEZ*
CASE  NO. 3:89-cv-00095-HRH
PAGE 4

50347v1

some uncertainty as to who in "management" supplied the figures on which BAS and Greene relied.  Greene testified that the supposed percentage price impacts from the oil spill for the various years and salmon species came from Mr. Shupe of CIP.  Deposition of Lindon Greene ("Greene CIP Depo.") at 278:3-280:11.  Mr. Shupe had no recollection that he supplied such figures, and could not explain the basis for them.  Shupe Depo. taken on May 12, 2006 at 253:7-254:24.   The figures for NMI appear to have come from Mr. Waterer, although they are identical to the figures for CIP.  Waterer Depo. at 254:20-255:18.

- Messrs. Waterer and Shupe present conclusory testimony to the effect that

prices were down and that they attributed the decline to their loss of negotiating power with buyers.  Here is what Mr. Waterer says:

> Q. How did you determine what percentage [reduction] to apply to a price reduction claim in 1990 and '91?
>
> A. Well, I knew what our preseason market prices were in general, and I knew what the post oil spill market prices were, and there clearly was a decline, and I looked at that in our own experience and came up with these numbers.
>
> Q. Anything else that you relied on in determining what percentages to allocate to the lost price claim in 1990 and '91?
>
> A. Well, the attempt was to reflect a decreasing market price which was actually occurring, and that we had lost substantial negotiating power with a large segment of the world -- or the customers from different segments of the world with whom we have dealt in the past.

Waterer Depo. at 255:11-256:2.  Or here is Mr. Shupe's story, as told to Mr. Greene:

MEMORANDUM IN SUPPORT OF MOTION OF DEFENDANTS EXXON MOBIL CORPORATION (D-1) AND EXXON SHIPPING COMPANY (D-2) IN SUPPORT OF MOTION IN LIMINE TO PRECLUDE EVIDENCE OF DAMAGES CAUSED BY SALMON PRICE DECLINES
*IN RE THE EXXON VALDEZ*
CASE  NO. 3:89-cv-00095-HRH
PAGE 5

50347v1

>Q. At some point in your discussions is it correct that Mr. Shupe communicated to you that during his negotiations over the price that CIP was going to get for its salmon, the oil spill was raised as a factor for paying CIP a lower price? Is that correct?
>
>A. Yes.
>
>Q. What did he tell you about those negotiations?
>
>A. What I generally recollect is that he indicated that the Japanese buyers -- and I'm using Japanese, I'm not saying just Japanese, but I'm saying Japanese buyers were very masterful, if I can use that word, in terms of negotiation, that they knew there was an oil spill, that the balance of the negotiating power changed and that his perception was that they knew that they were in the driver's seat, and that he felt more or less that they could force him to accept a lower price because of the oil spill.

Greene CIP Depo 285:13-286:4.

As we show next, these claims are no different than what was presented to the jury, and rejected, in 1994. They are barred by the doctrines of both law-of-the-case and collateral estoppel.

## II. THE PROCESSORS' SALMON PRICE CLAIMS HAVE ALREADY BEEN LITIGATED IN THIS CASE AND ARE THUS BARRED UNDER THE DOCTRINE OF THE LAW-OF-THE-CASE.

"The 'law of the case' rule ordinarily precludes a court from re-examining an issue previously decided by the same court, or a higher appellate court, in the same case." *Pit River Home and Agric. Coop. Assoc. v. U.S.*, 30 F.3d 1088, 1096 (9th Cir. 1994) (quoting *Moore v. Jas. H. Matthews & Co.*, 682 F.2d 830, 833 (9th Cir. 1982)). A decision on a factual or legal issue "*must be followed in all subsequent proceedings in the same case in the trial court*…unless

MEMORANDUM IN SUPPORT OF MOTION OF DEFENDANTS EXXON MOBIL CORPORATION (D-1) AND EXXON SHIPPING COMPANY (D-2) IN SUPPORT OF MOTION IN LIMINE TO PRECLUDE EVIDENCE OF DAMAGES CAUSED BY SALMON PRICE DECLINES
*IN RE THE EXXON VALDEZ*
CASE NO. 3:89-cv-00095-HRH
PAGE 6

50347v1

the evidence on a subsequent trial was substantially different, controlling authority has since made a contrary decision of the rule of law applicable to such issues, or the decision was clearly erroneous and would work a manifest injustice." *Id.* at 1096-97 (emphasis supplied). "Law of the case rules are founded upon 'the sound public policy that litigation must come to an end.'" *Jeffries v. Wood*, 114 F.3d 1484, 1489 (9th Cir. 1997) (quoting *Kimball v. Callahan*, 590 F.2d 768, 771 (9th Cir. 1979)).

The processors' damages case is a mere subpart or phase of a much larger, highly complex litigation, which has been going on for more than fifteen years. The processors, therefore, are necessarily bound by the many earlier rulings. None of the established exceptions to the law-of-the-case doctrine apply to prevent the preclusion of evidence that the spill caused a decline in post-1989 salmon prices.

   A.  **The Evidence and Arguments are Similar, if Not Identical.**

The only exception to the law-of-the-case rule worth discussing here is whether the processors' evidence will be "substantially different" from that offered in the earlier phase.[3] *See Pit River Home and Agric. Coop. Assoc.*, 30 F.3d at 1096-97. Whatever evidence the processors might introduce to prove their current price claim damages, such as sales data, market quotes, sales receipts, or expert testimony about the price effects of the spill, would be similar if not identical to that introduced during Phase IIA. Moreover, whatever factual data from 1990

---

[3] The other two exceptions are clearly inapplicable. The Phase IIA verdict was not "clearly erroneous." *See Pit River Home and Agric. Coop. Assoc.*, 30 F.3d at 1096-97. And there has been no "contrary decision of the rule of law" that might apply here. *Id.*

MEMORANDUM IN SUPPORT OF MOTION OF DEFENDANTS EXXON MOBIL CORPORATION (D-1) AND EXXON SHIPPING COMPANY (D-2) IN SUPPORT OF MOTION IN LIMINE TO PRECLUDE EVIDENCE OF DAMAGES CAUSED BY SALMON PRICE DECLINES
*IN RE THE EXXON VALDEZ*
CASE NO. 3:89-cv-00095-HRH
PAGE 7

50347v1

through 1993 is available today would certainly have been available for use during the previous trial in 1994.  Therefore, the processors' evidence this time around would not be "substantially different" than in 1994.  In fact, it would be substantially the same -- if not identical -- to that previously offered.

Comparing the expert testimony the processors now offer with the expert testimony offered by the Consolidated Plaintiffs in 1994 shows just how similar the two sets of evidence are.  For instance, in discussing the effect of the spill on the price of Alaskan seafood, Mr. Shupe contends that "I don't know of any advertising campaign that could have been more destructive to an industry than a beautiful area in Alaska contaminated with 10 million gallons of oil."  Shupe Depo taken on April 26, 2006 at 114:8-11.  This is strikingly similar to the Consolidated Plaintiffs' testimony in 1994 that "[t]he Exxon Valdez spill damaged the reputation or damaged the image of high quality fish coming out of the Alaska seafood market, and this resulted in lower prices for those fish from 1989 through 1991."  (30/5181 (Mendelsohn).

Similarly, Messrs. Waterer, Shupe and Greene all assert (as discussed above) that salmon prices declined because purchasers, especially Japanese purchasers, were able to negotiate lower prices for salmon coming from oiled areas.  Again, this is nearly identical to the Consolidated Plaintiffs' expert testimony in 1994 that "the spill has the effect, among other things, of giving a tremendously strong bargaining tool to the buyer and as a result the price tends to be as low as he can possibly push it to hedge against the risk of uncertain and perhaps disastrous results on his inventory and his business."  (29/5058 (Crutchfield))

MEMORANDUM IN SUPPORT OF MOTION OF DEFENDANTS EXXON MOBIL CORPORATION (D-1) AND EXXON SHIPPING COMPANY (D-2) IN SUPPORT OF MOTION IN LIMINE TO PRECLUDE EVIDENCE OF DAMAGES CAUSED BY SALMON PRICE DECLINES
*IN RE THE EXXON VALDEZ*
CASE  NO. 3:89-cv-00095-HRH
PAGE 8

50347v1

Moreover, the similarity between the processors' current evidence of price declines and that offered during Phase IIA can be seen in counsel's closing arguments in the 1994 trial. Arguing that the spill harmed the perceived safety of Alaskan seafood, which put downward pressure on Alaskan seafood prices, plaintiffs' counsel asserted during closing argument that "83 percent of consumers were aware of the spill…. 48 percent of Alaska consumers didn't believe Alaska seafood was safe to eat....," and rhetorically asked the jury, "[n]ow is this good for price?" (38/6881-82.)  Mr. Shupe asserts, along exactly the same lines, that, "I haven't seen an oily fish [in 1990] and I hadn't seen an oily fish in 1989, but that isn't what the public is thinking because of the things they're bringing me in the newspaper, Exxon oil spill, big oil spill, big, big headlines in a lot of Japanese newspapers and the media caught hold of that and just crucified the Alaska Gulf of Alaska fishery and salmon and halibut." Shupe Depo. taken on April 26, 2006, at 129:11-18.

### B.     Plaintiffs, in 1994, Made No Distinction Between the Decline in Prices Paid to Fishermen and Prices Paid to Processors.

Nor may the processors successfully oppose this motion arguing that the 1994 jury made no determination as to the effect of the spill on prices paid to *processors* and that the jury decided only that prices paid to *fishermen* did not decline due to the spill.  During the 1994 trial, the Consolidated Plaintiffs treated all prices, whether paid to fishermen or processors as similarly affected by the spill.  For example, the Consolidated Plaintiffs specifically pointed to the fall in wholesale market prices -- *i.e.* the prices Japanese importers pay *processors* for their product, not

MEMORANDUM IN SUPPORT OF MOTION OF DEFENDANTS EXXON MOBIL CORPORATION (D-1) AND EXXON SHIPPING COMPANY (D-2) IN SUPPORT OF MOTION IN LIMINE TO PRECLUDE EVIDENCE OF DAMAGES CAUSED BY SALMON PRICE DECLINES
*IN RE THE EXXON VALDEZ*
CASE NO. 3:89-cv-00095-HRH
PAGE 9

50347v1

the price the fishermen receive -- in support of its claims. In closing argument in 1994, counsel asserted that

> *The Tokyo Central Wholesale Market is a good barometer of what's happening in Japan, it's the largest fish market in Japan. And this accurately depicts what happened.* As a general statement, life was good and getting better, and then it crashes, and it crashes after the oil spill. Why? [The] Burson-Marsteller Report gives us some indication 83 percent of consumers were aware of the spill, 50 percent of the consumers were not eating at much seafood, 58 percent of the consumers avoided eating Alaska seafood. 48 percent of Alaska consumers didn't believe Alaska seafood was safe to eat. *Only 13 percent believed it was safe to eat. Same thing with the traders. Now is this good for price?* Can't be."[4]

(38/6881-82.)

---

[4] The Consolidated Plaintiffs' expert, James Crutchfield, described to the 1994 jury how the Tokyo Central Wholesale Market works and how prices are determined, as follows:

> Q. Now, would you talk for a minute -- you mentioned the Tokyo Central Wholesale Market. Would you talk about that for a minute. Tell us what it is, what economic function it plays.
>
> A. *It's a very large wholesale market. Performs a traditional wholesale function of bringing together in one place large amounts of fish, many varieties of fish, many processed forms.* Within the market there are several categories of buyers, some of whom are able to resell within the market, some can only buy within the market and then take the fish out. There are large numbers of sellers, well over a thousand, and *their basic economic function really is to integrate the forces of supply and demand and set a price for each of the various types of fish that they handle. This is the place where most of the market forces come to bear on the price of fish in Japan.* There would be variations because there are variations in consumer patterns in different parts of the country, but, generally speaking, prices in other markets follow very closely those that are determined in the Tokyo wholesale market.

(29/5053-54 and 5058.)

MEMORANDUM IN SUPPORT OF MOTION OF DEFENDANTS EXXON MOBIL CORPORATION (D-1) AND EXXON SHIPPING COMPANY (D-2) IN SUPPORT OF MOTION IN LIMINE TO PRECLUDE EVIDENCE OF DAMAGES CAUSED BY SALMON PRICE DECLINES
*IN RE THE EXXON VALDEZ*
CASE NO. 3:89-cv-00095-HRH
PAGE 10

50347v1

Moreover, Interrogatory Nos. 19 and 21 from the special verdict ask generically whether the oil spill was "a legal cause of a decline in prices paid in 1990 (or 1991) for salmon of that species caught by plaintiffs." (Special Verdict at pp.10-11.) The jury said, "No." The questions are not limited to a decline in the prices paid to *fishermen*. That is because during Phase IIA, the Consolidated Plaintiffs based their claim of a decline in salmon prices in large part on evidence of prices paid to Alaskan processors. In fact, it was plaintiffs' own expert who established this:

> Q. And that (declining prices) eventually affects the price that the fishermen gets from the processor?
>
> A. Right. Actually, it's almost a direct affect because the processor feels the Japanese pressure very, very quickly, and he adjusts to that by pricing downward to the fishermen.

29/5058:9-13 (Mundy).

## III. THE PROCESSORS' PRICE EFFECT CLAIMS ARE ALSO BARRED BY THE DOCTRINE OF COLLATERAL ESTOPPEL.

The doctrine of collateral estoppel also precludes litigation of issues that have already been decided. It provides that "once an *issue* is actually litigated and necessarily determined, that determination is conclusive in subsequent suits…" *Peck v. C.I.R.,* 904 F.2d 525, 527 (9th Cir. 1990) (quoting *United States v. ITT Rayonier, Inc.,* 627 F.2d 1000, 1000 (9th Cir. 1980)). For a claim to be precluded under this doctrine: "(1) the issue at stake must be identical to the one alleged in the prior litigation; (2) the issue must have been actually litigated in the prior litigation, and (3) the determination of the issue in the prior litigation must have been a critical and necessary part of the judgment in the earlier action." *Clark v. Bear Sterns & Co.,* 966 F.2d 1318, 1312 (9th Cir. 1992). A determination of preclusion by collateral estoppel is binding on

MEMORANDUM IN SUPPORT OF MOTION OF DEFENDANTS EXXON MOBIL CORPORATION (D-1) AND EXXON SHIPPING COMPANY (D-2) IN SUPPORT OF MOTION IN LIMINE TO PRECLUDE EVIDENCE OF DAMAGES CAUSED BY SALMON PRICE DECLINES
*IN RE THE EXXON VALDEZ*
CASE  NO. 3:89-cv-00095-HRH
PAGE 11

50347v1

parties to the prior litigation and their privies.  *See Shaw v. Hahn,* 627 F.2d 1000, 1131 (9th Cir. 1995).  Each of these elements is satisfied here.

      **A.**      **The Issue of Whether the Spill Caused a Decline in Prices for Alaskan Salmon was Litigated in Phase IIA.**

As discussed above, the issue of whether the oil spill caused the price of Alaskan seafood products to decline in the years after the oil spill was raised by the Consolidated Plaintiffs in Phase IIA of this case, and may not be relitigated.  As previously discussed, the similarity between the arguments the processors currently make, and the evidence and arguments offered by the Consolidated Plaintiffs during the 1994 trial allows only one conclusion: that the processors' present claims are identical to those asserted in 1994.  *See Kamilche Co. v. U.S.*, 53 F.3d 1059, 1062 (9th Cir. 1995).

Although the processors may attempt to distinguish their current claims on the ground that they now extend through 1993, whereas in Phase IIA the claims ran only through 1991, this distinction is of no consequence.  The Ninth Circuit has unequivocally determined that collateral estoppel applies even when the claims are for different time periods, so long as the issue is the same.  *In re Dual Deck Video Cassette Record Antitrust Litig.*, 11 F.3d 1460, 1463-65 (9th Cir. 1993) (when "no new acts" are alleged and "[d]istinct conduct is alleged only in the limited sense that every day is a new day…" the issue is precluded).  *Id*. at 1464.  Simply stated, retrying the same issue by simply changing the time period, when the defendant has engaged in no new acts, is not permitted.  *Id.*  Thus, the processors cannot save their claims simply by alleging price

MEMORANDUM IN SUPPORT OF MOTION OF DEFENDANTS EXXON MOBIL CORPORATION (D-1) AND EXXON SHIPPING COMPANY (D-2) IN SUPPORT OF MOTION IN LIMINE TO PRECLUDE EVIDENCE OF DAMAGES CAUSED BY SALMON PRICE DECLINES
*IN RE THE EXXON VALDEZ*
CASE  NO. 3:89-cv-00095-HRH
PAGE 12

50347v1

effects in new years.  The issue of price effects after 1989 has already been litigated.  The jury found that there were none.

Further, any argument that the processors' current claims are different because they cover more years than the Phase IIA verdict defies logic.  The spill was a one-time event.  Its effects were most pronounced immediately after its occurrence, and became less so over time.  No evidence exists to suggest that the 1989 spill could have had no effect on prices in 1990 and 1991, but a renewed effect in 1992 and 1993.  Since "the issue is whether rational jurors must necessarily have determined the issue as to which estoppel is sought, " and no rational juror in Phase IIA could have concluded that the spill had no price effects in either 1990 or 1991, but did so in 1992 and 1993, the processors are necessarily estopped from asserting negative price effects caused by the spill in 1992 and 1993.  See *Chew v. Gates*, 27 F.3d 1432, 1438 (9th Cir. 1994) (collateral estoppel permitted if issue actually and necessarily decided).   Thus, the fact that the processors' claims cover two more years than did the Consolidated Plaintiffs' does not save those claims from the preclusive effects of the Phase IIA verdict;  claims for 1992 and 1993 are precluded, just as are claims for 1990 and 1991.

### B. The Issue was Actually Litigated.

As previously discussed, the issue of whether the spill caused price declines in the years after 1989 was extensively litigated.  For example, during the 1994 trial the Consolidated Plaintiffs offered several witnesses who testified exclusively about price effects, and whose testimony fills hundreds of pages.  Defendants responded with numerous witnesses of their own.

MEMORANDUM IN SUPPORT OF MOTION OF DEFENDANTS EXXON MOBIL CORPORATION (D-1) AND EXXON SHIPPING COMPANY (D-2) IN SUPPORT OF MOTION IN LIMINE TO PRECLUDE EVIDENCE OF DAMAGES CAUSED BY SALMON PRICE DECLINES
*IN RE THE EXXON VALDEZ*
CASE  NO. 3:89-cv-00095-HRH
PAGE 13

50347v1

And plaintiffs' counsel devoted considerable time to the issue during closing argument. Clearly the issue was thoroughly and vigorously litigated.

      **C.    The Processors Are in Privity with the Phase IIA Plaintiffs.**

"[A] non-party may be bound [by an earlier case] if a party is so closely aligned with its interests as to be its 'virtual representative.' This contemplates an express or implied legal relationship by which parties to the first suit are accountable to *non*-parties who file a subsequent suit with identical issues." *U.S. v. ITT Rayonier, Inc.*, 627 F.2d 996, 1003 (9th Cir. 1980). The existence of an express legal relationship, which is more than sufficient to establish privity between the Phase IIA plaintiffs and the processors, was established by the Agreement Among Counsel Regarding Joint Prosecution, Settlement and Damages Allocation ("Joint Prosecution Agreement"), which states:

> This agreement is entered into among counsel representing all or virtually all plaintiffs whose claims have been asserted in the consolidated Exxon Valdez Oil spill litigation in the United States District Court for the District of Alaska and the Superior Court for the State of Alaska, for the purposes of maximizing recovery from Exxon on behalf of all plaintiffs.

At 1 (citations omitted). Pursuant to this agreement, the processors had an explicitly defined financial interest in the proceeds of any judgment obtained in Phase IIA.

The Court may recall that the Joint Prosecution Agreement was signed in the summer of 1994, and was thereafter slightly revised in the superseding Agreement signed in the spring of

MEMORANDUM IN SUPPORT OF MOTION OF DEFENDANTS EXXON MOBIL CORPORATION (D-1) AND EXXON SHIPPING COMPANY (D-2) IN SUPPORT OF MOTION IN LIMINE TO PRECLUDE EVIDENCE OF DAMAGES CAUSED BY SALMON PRICE DECLINES
*IN RE THE EXXON VALDEZ*
CASE NO. 3:89-cv-00095-HRH
PAGE 14

50347v1

1995,[5] and subsequently embodied in the Plan of Allocation and Plans of Distribution approved by the Court.  At the time of the Joint Prosecution Agreements, Cook Inlet Processing was represented by the firm of Faegre & Benson, and Mr. O'Neill signed both agreements on CIP's behalf.  Nautilus Marine, Inc., was then represented by Randall Scarlett, who signed both agreements on behalf of Nautilus.  The processors' current counsel, Mr. Weidner, also signed both agreements on behalf of all of his clients.  Some time in 1996 or thereafter, a dispute arose between the processors, on the one hand, and the remaining Consolidated Plaintiffs, on the other, concerning whether the Consolidated Plaintiffs' allocation formula, which prevented the processors from sharing in any punitive damages recovery because they had given Exxon a full release of punitive damages, was valid.  After considerable litigation, both this Court and the Ninth Circuit held that the processors' releases of punitive damages barred them from sharing in any punitive damages recovery, and upheld the Consolidated Plaintiffs' formula.  Cook Inlet Processors, Inc. v. Baker, 2000 WL 1844460 (9th Cir., Dec. 14, 2000).  Some time after the Ninth Circuit's ruling, the processors and the other Consolidated Plaintiffs entered into an agreement which resolved their disputes, under the terms of which the processors waived any further right to share in any recoveries by other Consolidated Plaintiffs, and the other Consolidated Plaintiffs waived any further right to share in any recoveries by the processors.  None of this subsequent history changes the fact that as of the time of the 1994 trial of Phase IIA, both CIP and NMI were bound by the Joint Prosecution Agreements, and were unquestionably in privity with the

---

[5] Copies of these two agreements, with signature pages, are attached hereto as Exhibit C.

MEMORANDUM IN SUPPORT OF MOTION OF DEFENDANTS EXXON MOBIL CORPORATION (D-1) AND EXXON SHIPPING
COMPANY (D-2) IN SUPPORT OF MOTION IN LIMINE TO PRECLUDE EVIDENCE OF DAMAGES CAUSED BY
SALMON PRICE DECLINES
*IN RE THE EXXON VALDEZ*
CASE NO. 3:89-cv-00095-HRH
PAGE 15

50347v1

rest of the plaintiffs. Indeed, CIP's own lawyer, Mr. O'Neill, was the lead lawyer in 1994, and prosecuted the unsuccessful post-1989 price claims.

It is self-evident that the Joint Prosecution Agreement establishes privity among CIP, NMI, and the Phase IIA plaintiffs, given that all parties to the agreement were granted a pecuniary interest in any and all recoveries awarded against Exxon. This is especially clear in light of the wide variety of circumstances in which the Ninth Circuit has found privity. *Jackson v. Hayakawa*, 605 F.2d 1121, 1126 (9th Cir. 1979) ("courts are no longer bound by rigid definitions of the parties or their privies for the purposes of applying collateral estoppel or res judicata."); *U.S. v. Geophysical Corp. of Alaska*, 732 F.2d 693, 697-98 (9th Cir. 1984) (after partnership lost its challenge to regulations requiring it to release data gathered under certain permits, the partners were collaterally estopped from separately seeking to invalidate the regulations); *In re Dominelli*, 820 F.2d 313, 316-17 (9th Cir. 1987) (precluding junior lienholder from relitigating validity of the senior lienholder's interest provision where that claim had already been decided in a suit brought by bankruptcy trustee); *Davis Wright & Jones v. Nat'l Union Fire Ins.*, 709 F. Supp. 196, 202-03 (W.D. Wash. 1989) (holding that insurance company could not sue law firm after suing firm's client for the same fraud).

### IV. IN ANY EVENT, THE PROCESSORS MAY NOT PRESENT A CLAIM OF MARKET DISRUPTION WITHOUT EXPERT TESTIMONY, WHICH THEY DO NOT OFFER.

Even if the processors' claim were not barred by law of the case and collateral estoppel, this motion would have to be granted. It is plain that the causes of price declines in a

MEMORANDUM IN SUPPORT OF MOTION OF DEFENDANTS EXXON MOBIL CORPORATION (D-1) AND EXXON SHIPPING COMPANY (D-2) IN SUPPORT OF MOTION IN LIMINE TO PRECLUDE EVIDENCE OF DAMAGES CAUSED BY SALMON PRICE DECLINES
*IN RE THE EXXON VALDEZ*
CASE NO. 3:89-cv-00095-HRH
PAGE 16

50347v1

complicated, international market like the one for salmon present a situation where "scientific, technical, or other specialized knowledge" will assist the jury within the meaning of Rule 702, F.R. Evid.  Accordingly, a witness not testifying as an expert may not present such testimony. Rule 701(c).  *See Am. Booksellers Ass'n, Inc. v. Barnes & Noble, Inc.*, 135 F. Supp. 2d 1031, 1042 (N.D. Cal. 2001) (recognizing in antitrust case that "[p]laintiffs cannot prove causation of actual injury without . . . expert testimony, because only expert testimony can demonstrate that any injury to plaintiffs was caused by defendants' unlawful conduct, and not because of lawful competition or other factors").  Instead, plaintiffs' damages report relies on unsupported assumptions by Messrs. Shupe and Waterer about the figures to use to calculate price effects damages.  *See* Shupe Depo. taken on July 31, 2006 at 65:12-70:18.  Such assumptions cannot form the basis of reliable expert testimony.  *See McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 807-08 (9th Cir. 1988) (affirming summary judgment where damage reports relied on unsupported assumptions); *Chrysler Credit Corp. v. J. Truett Payne Co.*, 670 F.2d 575, 581-82 (5th Cir. 1982) (finding defendant entitled to a directed verdict where plaintiff's evidence of damages was based on "self-serving and unsupported assumptions"); *Merit Motors, Inc. v. Chrysler Corp.*, 569 F.2d 666, 673 (D.C. Cir. 1977) (affirming exclusion of expert testimony in antitrust case because it made unsupported assumptions about elasticities of demand in various markets, and ignored the impact of other dominant forces in the relevant market).

   In 1994, the Consolidated Plaintiffs correctly recognized that expert testimony was necessary in order to present evidence of the causes of a claimed decline in the salmon market. Accordingly, they made their claim by testimony from experts, notably Dr. Robert Mendelsohn,

MEMORANDUM IN SUPPORT OF MOTION OF DEFENDANTS EXXON MOBIL CORPORATION (D-1) AND EXXON SHIPPING COMPANY (D-2) IN SUPPORT OF MOTION IN LIMINE TO PRECLUDE EVIDENCE OF DAMAGES CAUSED BY SALMON PRICE DECLINES
*IN RE THE EXXON VALDEZ*
CASE  NO. 3:89-cv-00095-HRH
PAGE 17

50347v1

a professor of environmental studies at Yale University, who offered the jury a complicated economic model that took into account the multiple factors affecting the world wide salmon market, and concluded that the oil spill, and not other potential causative factors, was responsible for a significant portion of the decline in salmon prices in the years 1989-91.  The 1994 jury accepted Mendelsohn's evidence for the year 1989, but rejected it in subsequent years.

Unlike the Consolidated Plaintiffs in 1994, the processors have offered no witness qualified by skill and training to opine on the causes of changes in salmon pricing.  Their damages report expressly <u>disclaims</u> reliance on Mendelsohn's report.  Plaintiffs thus cannot piggyback on the 1994 evidence.  In the context of a complicated market such as this one, with potentially multiple factors affecting price changes, plaintiffs must produce expert testimony to support their claim that the price of salmon declined due to the oil spill.  It follows that they do not offer competent evidence that the oil spill caused a decline in salmon prices in 1990 or any subsequent year, and that this motion in limine should be granted.

**CONCLUSION**

For all the foregoing reasons, Exxon respectfully requests that this Court grant this motion in *limine,* and issue an order precluding the introduction of evidence or argument at the upcoming trial that declining prices for Alaskan salmon were caused by the oil spill.

Respectfully submitted this 16th day of August 2006.

MEMORANDUM IN SUPPORT OF MOTION OF DEFENDANTS EXXON MOBIL CORPORATION (D-1) AND EXXON SHIPPING COMPANY (D-2) IN SUPPORT OF MOTION IN LIMINE TO PRECLUDE EVIDENCE OF DAMAGES CAUSED BY SALMON PRICE DECLINES
*IN RE THE EXXON VALDEZ*
CASE NO. 3:89-cv-00095-HRH
PAGE 18

50347v1

By:   s/John F. Clough, III (consent)
John F. Clough, III
CLOUGH & ASSOCIATES, PC
P.O. Box 211187
Auke Bay, AK 99821
Phone: (907) 790-1912
Fax: (907) 790-1913
Email: cloughpc@alaska.net
Alaska Bar Association No. 8106011
Counsel for Exxon Mobil Corporation (D-1)

By:   s/Douglas J. Serdahely
Douglas J. Serdahely
PATTON BOGGS LLP
601 West Fifth Avenue, Suite 700
Anchorage, Alaska 99501
Phone: (907) 263-6310
Fax: (907) 263-6345
Email: dserdahely@pattonboggs.com
Alaska Bar No. 7210072
Counsel for Exxon Shipping Company (D-2)

**CERTIFICATE OF SERVICE**

I hereby certify that on August 16, 2006, I caused a true and correct copy of the foregoing document to be served on the following via:

☐ US Mail    ☐ Fax    ☑ **Electronically**

    Phillip Paul Weidner, Esq.
    Phillip Paul Weidner & Associates
    330 L Street, Suite 200
    Anchorage, Alaska 99501

By:   /Maribel Webber
    Legal Secretary/Assistant
    PATTON BOGGS LLP

MEMORANDUM IN SUPPORT OF MOTION OF DEFENDANTS EXXON MOBIL CORPORATION (D-1) AND EXXON SHIPPING COMPANY (D-2) IN SUPPORT OF MOTION IN LIMINE TO PRECLUDE EVIDENCE OF DAMAGES CAUSED BY SALMON PRICE DECLINES
*IN RE THE EXXON VALDEZ*
CASE NO. 3:89-cv-00095-HRH
PAGE 19

50347v1