**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

In re: THE EXXON VALDEZ,

_____

GRANT BAKER; SEA HAWK
SEAFOODS, INC.; COOK INLET
PROCESSORS INC.; SAGAYA CORP.;
WILLIAM MCMURREN; PATRICK L.
MCMURREN; WILLIAM W. KING;
GEORGE C. NORRIS; HUNTER CRANZ;
RICHARD FEENSTRA; WILDERNESS
SAILING SAFARIS; SEAFOOD SALES,
INC.; RAPID SYSTEMS PACIFIC LTD.;
NAUTILUS MARINE ENTERPRISES INC.;
WILLIAM FINDLAY ABBOTT, JR.,
            *Plaintiffs-Appellees,*

            v.

EXXON MOBIL CORP.; EXXON
SHIPPING CO.,
            *Defendants-Appellants.*

No. 04-35182

D.C. No.
CV-89-00095-HRH

OPINION

In re: The Exxon Valdez,

Grant Baker; Sea Hawk
Seafoods, Inc.; Cook Inlet
Processors Inc.; Sagaya Corp.;
William McMurren; Patrick L.
McMurren; William W. King;
George C. Norris; Hunter Cranz;
Richard Feenstra; Wilderness
Sailing Safaris; Seafood Sales,
Inc.; Rapid Systems Pacific Ltd.;
Nautilus Marine Enterprises Inc.;
William Findlay Abbott, Jr.,
   *Plaintiffs-Appellants,*

v.

Exxon Mobil Corp.; Exxon
Shipping Co.,
   *Defendants-Appellees.*

No. 04-35183

D.C. No.
CV-89-00095-HRH

Appeal from the United States District Court
for the District of Alaska
H. Russel Holland, District Judge, Presiding

Argued and Submitted
December 15, 2008—Pasadena, California

Filed June 15, 2009

Before: Mary M. Schroeder, Andrew J. Kleinfeld and
Sidney R. Thomas, Circuit Judges.

Opinion by Judge Schroeder;
Partial Concurrence and Partial Dissent by Judge Kleinfeld

## COUNSEL

Jeffrey L. Fisher, Davis Wright Tremaine LLP, Stanford, California, for the plaintiffs-appellees-appellants.

Jonathan Hacker, O'Melveny & Myers LLP, Washington, DC, for the defendants-appellants-appellees.

## OPINION

SCHROEDER, Circuit Judge:

This epic punitive damage litigation arising from the 1989 wreck of the Exxon Valdez is before us once again. This time it is after the United States Supreme Court remanded the case to us to decide issues related to interest and appellate costs. Order in *Exxon Shipping Co. v. Baker*, No. 07-219 (S. Ct. filed June 25, 2008). The remand followed the Court's 5-3 decision that, under maritime law, the maximum ratio of punitive damages to compensatory damages is 1-1. *Exxon Shipping Co. v. Baker*, 128 S. Ct. 2605, 2633 (2008). On the issue of the availability of vicarious liability for punitive damages under maritime law, the Court was evenly divided and thus left in place our 2001 decision that punitives are available under precedents binding on this court. *Id.* at 2616; *see In re Exxon Valdez*, 270 F.3d 1215,1233-36 (9th Cir. 2001) (citing *The Amiable Nancy*, 16 U.S. (3 Wheat) 546 (1818)); *Protectus Alpha Navigation Co., Ltd. v. N. Pac. Grain Growers, Inc.*, 767 F.2d 1379 (9th Cir. 1985)).

The parties have now stipulated to the entry of judgment against the defendant Exxon and in favor of the plaintiffs

Baker *et al.* in the amount of $507.5 million, representing the amount the plaintiffs were awarded as compensatory damages for the income they lost as a result of the massive oil spill. This judgment achieves the 1-1 ratio the Supreme Court deemed appropriate. We delayed issuance of the mandate at the parties' request and asked for supplemental briefing and argument on the issues the Supreme Court left unanswered: interest and costs.

*Interest*

[1] The issue with respect to interest is whether interest on the $507.5 million should run from the date of the original judgment, entered in 1996, or whether interest should run only from the 2008 date that we entered judgment for plaintiffs in the wake of the Supreme Court's decision. Exxon, of course, argues for the later date; plaintiffs, for the earlier.

[2] There is no dispute that post-judgment interest must be awarded, because 28 U.S.C. § 1961 provides that interest:

> shall be allowed on any money judgment in a civil case recovered in a district court . . . . Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the coupon issue yield equivalent (as determined by the Secretary of the Treasury) of the average accepted auction price for the last auction of fifty-two week United States Treasury bills settled immediately prior to the date of the judgment.

28 U.S.C. § 1961 (1994 & Supp. II 1996). The Supreme Court has explained that the "purpose of post-judgment interest is to compensate the successful plaintiff for being deprived of compensation for the loss from the time between the ascertainment of the damage and the payment by the defendant." *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827,

835-36 (1990) (quoting *Potelo v. Consol. Rail Corp.*, 826 F.2d 1270, 1280 (3d Cir. 1987)).

**[3]** The issue here arises because the final $507.5 million judgment of punitive damages represents a substantial reduction of the original district court judgment. Where a damages award has been remitted, Federal Rule of Appellate Procedure 37(b) gives an appellate court discretion as to whether to allow interest to run from the date of the original judgment, or from the date of the remitted judgment. Rule 37(b) specifically provides as follows: "If the [appellate] court modifies or reverses a judgment with a direction that a money judgment be entered in the district court, the mandate must contain instructions about the allowance of interest." Fed. R. App. P. 37(b).

**[4]** Interest accrues on the reduced amount, not on the higher amount that was vacated or remitted. *Planned Parenthood of Columbia/Willamette Inc. v. Am. Coal. of Life*, 518 F.3d 1013 (9th Cir. 2008). In *Planned Parenthood*, we explained the framework for determining the allowance of interest:

> Post-judgment interest must run from the date of a judgment when the damages were supported by the evidence and meaningfully ascertained. We may reverse and remand a judgment without concluding that it is erroneous or unsupported by the evidence. When the legal and evidentiary basis of an award is thus preserved, post-judgment interest is ordinarily computed from the date of [the judgment's] initial entry.

*Id.* at 1017-18 (internal quotation marks and citations omitted) (alterations in original). *Planned Parenthood* thus makes it clear that interest ordinarily should be computed from the date of the original judgment's initial entry when the evidentiary and legal bases for an award were sound. *Id.*

Exxon contends that the legal basis for an award was not sound in 1996, arguing that until the Supreme Court handed down its 2008 decision in this case, the law did not allow vicarious liability for punitive damages in maritime cases. Yet, an evenly divided Supreme Court left in place our 2001 opinion that punitives were recoverable, and we in turn relied on Supreme Court and Ninth Circuit precedent of long standing. *See In re Exxon Valdez*, 270 F.3d at 1233-36 (citing *The Amiable Nancy*, 16 U.S. 546, and *Protectus Alpha Navigation*, 767 F.2d 1379).

**[5]** We therefore conclude that plaintiffs' entitlement to punitives was "meaningfully ascertained" when the original district court judgment was entered in 1996. Neither the evidentiary basis for the award nor the legal foundation for an award has been disturbed after nearly a dozen years of subsequent litigation. We see no reason to depart from *Planned Parenthood*'s general rule in this case. The plaintiffs are entitled to interest from that date on the principal amount they ultimately are entitled to receive, $507.5 million.

As to the rate, the parties agree that the "average accepted auction price for the last auction of fifty-two week United States Treasury bills" was 5.9% on September 12, 1996. *See* 28 U.S.C. § 1961(a) (1994 & Supp. II 1996). We have no discretion to deviate from § 1961's instructions on the calculation of interest. *See Ford v. Alfaro*, 785 F.2d 835, 842 (9th Cir. 1986). Interest on the $507.5 million judgment shall, therefore, run from September 24, 1996 at the rate of 5.9%.

### Costs

Costs have become a point of contention in this case because of the size of the supersedeas security bond that Exxon posted to sustain its appeals, and also because of the length of time the case has taken to reach what we hope is now its conclusion. Thus, Exxon's total costs approach $70 million. Although Exxon has succeeded in reducing an origi-

nal jury verdict of $5 billion by about 90%, it remains liable
for a far-from-nominal punitive award of more than $500 mil-
lion.

[6] The controlling rule is Federal Rule of Appellate Proce-
dure 39(a)(4), which provides that where "a judgment is
affirmed in part, reversed in part, modified or vacated, costs
are taxed only as the court orders." Plaintiffs point to the last
time we issued a mandate on punitives in this case, in 2001,
when we ordered each party to bear its own costs. *In re Exxon
Valdez*, 270 F.3d at 1254. The punitive damages award had
been remitted at that time as well. Plaintiffs also stress that,
in a case of mixed judgment, where each side wins something,
this Court usually orders each party to bear its own costs.

Exxon contends that it is essentially the winner of the liti-
gation and that plaintiffs should bear all, or at least 90%, of
Exxon's appellate costs. With some 20/20 hindsight, Exxon
now characterizes the course of this case as having been all
about the amount of money Exxon would have to pay in puni-
tives. Having reduced that amount by 90%, it declares itself
the winner. Yet this ignores the hard-fought, even relentless,
battle Exxon waged to avoid any liability for punitives, a bat-
tle that resulted in an evenly divided decision by the Supreme
Court in 2008 leaving in place our 2001 decision on vicarious
liability. *Exxon Shipping Co.*, 128 S. Ct. at 2616.

To bolster its position, Exxon points to the fact that the
Supreme Court awarded Exxon its costs. But the default rule
before the Supreme Court is that when the lower judgment is
vacated, the petitioner gets costs "unless the Court otherwise
orders." Sup. Ct. R. 43.2. Rule 39 contains no such presump-
tion: when a judgment is modified, "costs are taxed only as
the court orders." Fed. R. App. P. 39(a)(4). The dissent does
not recognize the difference.

[7] In this case, neither side is the clear winner. The defen-
dant owes the plaintiffs $507.5 million in punitives — accord-

ing to counsel at oral argument the fourth largest punitive damages award ever granted. Yet that award represents a reduction by 90% of the original $5 billion. In light of this mixed result, and mindful that the equities in this case fall squarely in favor of the plaintiffs — the victims of Exxon's malfeasance — we exercise our discretion by requiring each party to bear its own costs.

Our decision is in accord with our usual practice when each side wins something and loses something. This court has consistently ordered each party to bear its own costs on appeals where punitive damages are upheld, but reduced. *See, e.g.*, *Mendez v. Cty. of San Bernardino*, 540 F.3d 1109, 1133 (9th Cir. 2008); *Planned Parenthood*, 422 F.3d at 967; *Bains LLC v. Arco Prods. of Atl. Richfield Co.*, 405 F.3d 764, 777 (9th Cir. 2005). We have even done so during the course of this litigation, under similar circumstances. *See In re Exxon Valdez*, 270 F.3d at 1254.

We are aware of two cases concerning reduced punitive damages where a court of appeals affirmed a district court's divided cost award. *See Republic Tobacco Co. v. N. Atl. Trading Co.*, 481 F.3d 442, 449 (7th Cir. 2007); *Emmenegger v. Bull Moose Tube Co.*, 324 F.3d 616, 626-27 (8th Cir. 2003). Whether a district court abuses its discretion in awarding costs under similar circumstances is quite different from the question of whether we should exercise our own discretion in that manner. Moreover, if we were to apportion costs on the basis of Exxon's proposed mathematical formula, i.e., to match the costs awarded to the percentage reduction of damages achieved during the appellate process, we would be inviting increased and wasteful litigation over the apportionment of costs. We see no reason to enter such a thicket, and that the dissent has found only one thirty-year-old out-of-circuit case adopting a similar approach validates our decision that it would be unwise to do so.

*Conclusion*

Because the evidentiary and legal bases for the original judgment of punitive damages have not been overruled, we award interest on the final judgment of $507.5 million, at the statutorily set rate of 5.9%, to run from the date of the original judgment, September 24, 1996. Because the amount of the original $5 billion judgment has been substantially reduced, we order that each party bear its own costs.

**[8]** The case is remanded to the district court for entry of the final judgment in accordance with this opinion.

---

KLEINFELD, J., concurring in part and dissenting in part:

I concur in the majority decision insofar as it rules in favor of the plaintiffs on interest. Plaintiffs should indeed have the benefit of interest from when they became entitled by judgment to punitive damages, September 24, 1996, at the rate they properly claim, 5.9%.[1] Exxon has had a half billion dollars of the plaintiffs' money ever since the district court entered judgment in their favor. Interest is required to compensate the plaintiffs for the delay in paying the plaintiffs their money.

I am unable to concur regarding costs. Satisfying though it may be to shovel money from a large corporation to those whom it wronged, respect for the Supreme Court decision in this case and precedent in other circuits obligates us to award Exxon most, but not all, of its costs for its mostly successful appeal. As this case proceeded, the district court initially upheld all,[2] and on remand, nearly all,[3] of the punitive dam-

---

[1] *See* 28 U.S.C. § 1961 (1994 & Supp. II 1996).

[2] *See In re Exxon Valdez* (*Exxon I*), 236 F. Supp. 2d 1043, 1068 (D. Alaska 2002) (noting the district court's rejection of Exxon's original motion for reduction or remittitur of the jury's $5 billion award).

[3] *Id.* at 1068-69 (reducing the award from $5 billion to $4 billion); *In re*

ages the jury awarded to the plaintiffs. We agreed with the plaintiffs that they were entitled to punitive damages,[4] and held that half of the original award ($2.5 billion) was not too high.[5] We turned out to be mistaken. The Supreme Court held that a tenth of the original award was as high as anyone — us, the district court, or the jury — could go.[6] After overturning our decision, the Supreme Court awarded costs to Exxon.[7] Due respect for the Supreme Court's decision obligates us, as a lower court, to exercise our discretion regarding costs in accord with how the Supreme Court exercised its discretion.

The majority says that Exxon "declares itself the winner," but it was really the Supreme Court of the United States that declared Exxon the winner. Our liability ruling in favor of the plaintiffs was indeed left "undisturbed," but only because the Court's tie vote on liability left our decision in place as to that issue.[8] The Court took pains to point out that leaving our decision in place did not mean we were correct.[9]

---

*Exxon Valdez* (*Exxon III*), 296 F. Supp. 2d 1071, 1110-11 (D. Alaska 2004) (reducing the award from $5 billion to $4.5 billion following an additional remand for reconsideration in light of *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408 (2003)).

[4]*In re Exxon Valdez* (*Exxon II*), 270 F.3d 1215, 1226, 1233-36 (9th Cir. 2001) (upholding punitive damages award).

[5]See *id.* at 1243, 1246-47 (remanding for reduction of the punitive damages award); *In re Exxon Valdez* (*Exxon IV*), 472 F.3d 600, 602, 623-25 (9th Cir. 2006) (per curiam) (reducing the punitive damages award to $2.5 billion).

[6]*Exxon Shipping Co. v. Baker*, 128 S. Ct. 2605, 2633-34 (2008) (holding that the "maximum" punitive damages award was $507.5 million).

[7]Judgment, *Exxon Shipping Co. v. Baker*, No. 07-219 (Aug. 12, 2008).

[8]*Exxon Shipping*, 128 S. Ct. at 2616.

[9]*Id.* ("[I]t should go without saying that the disposition here is not precedential on the derivative liability question."). An evenly divided decision does not expressly or impliedly approve of the lower court's reasoning, and does not require other circuits to follow it. *Neil v. Biggers*, 409 U.S. 188, 192 (1972) (quoting *Durant v. Essex Co.*, 74 U.S. (7 Wall.) 107, 112 (1869)).

The liability determination, which squeaked by in the Supreme Court, was merely a stepping stone on the way to the destination. The destination was money. On the money, it turned out that we were way off. The Supreme Court held that our decision, which reduced the award to $2.5 billion, was still $2 billion too high and 5 times more than could properly be awarded.[10] The Court concluded that the "upper limit" on the ratio of punitive damages to actual damages was 1 to 1.[11] Exxon thus obtained at least a 90% reduction in the punitive damages it owed.[12] After the Supreme Court handed down its decision, Exxon and the plaintiffs agreed to a punitive damages award of $507.5 million. We accepted this partial settlement, so the amount of punitive damages is established at that amount.

The majority is correct that Exxon fought a "relentless . . . battle" until the Supreme Court vacated the award for being far too high, but draws the wrong inference from the duration and intensity of that fight. Exxon was not obligated to accept our decision. Litigants have the right to appeal and petition for certiorari when in good faith they think a lower court has erred.[13] Exxon appealed and fought. The Supreme Court determined that Exxon was largely correct, more right than we were. The law requires Exxon to be compensated in part for that battle, not punished for it, because it turned out that Exxon was largely entitled to prevail, despite our opinions to the contrary. Humility requires us to accept that.

Federal Rule of Appellate Procedure 39 governs the award of costs on appeal. Under the rule, how well or how poorly

---

[10]*Exxon Shipping*, 128 S. Ct. at 2634.

[11]*See id.* at 2633-34.

[12]"[W]e take for granted the District Court's calculation of the total relevant compensatory damages at $507.5 million. A punitive-to-compensatory ratio of 1:1 thus yields maximum punitive damages in that amount." *Id.* at 2634 (citation omitted).

[13]*See* Fed. R. App. P. 3; Sup. Ct. R. 10.

a party does on appeal determines whether that party may collect any money from its opponent to cover the costs of the appeal.[14] It implements "the principle . . . that all cost items expended in the prosecution of the proceeding should be borne by the unsuccessful party."[15] This ancient principle was set out in the Statute of Gloucester in 1275.[16] It has been modified only in the details since its establishment. Neither the principle, nor our rule, use "costs" to mean what something actually cost. "Costs" means the certain listed expenditures a party has incurred for which it may seek reimbursement from the opposing party.[17] Exxon is not entitled to seek reimbursement under Rule 39 of the fortune it undoubtedly spent on attorneys' fees.[18] Allowable costs under Rule 39, for preparation and transmission of the record, for the reporter's transcript, and for filing a notice of appeal ($455), are relatively small.[19] But the one remaining element of allowable costs,

---

[14]Fed. R. App. P. 39(a).

[15]Fed. R. App. P. 39 advisory committee's note; *see United States v. Imperial Irrigation Dist.*, 595 F.2d 525, 532 (9th Cir. 1979) (explaining that "parties should be allowed costs [under Rule 39] in the case in which they prevailed"); *see also Am. Auto. Mfrs. Ass'n v. Comm'r, Mass. Dep't of Envtl. Prot.*, 31 F.3d 18, 28 (1st Cir. 1994) (noting that "[p]revailing parties are normally entitled to costs" under Rule 39); *Studiengesellschaft Kohle mBH v. Eastman Kodak Co.*, 713 F.2d 128, 131-32 (5th Cir. 1983) (same); *In re Penn Cent. Transp. Co.*, 630 F.2d 183, 189 (3d Cir. 1980) (same); *Delta Air Lines, Inc. v. Civil Aeronautics Bd.*, 505 F.2d 386, 387 -88 (D.C. Cir. 1974) (same).

[16]Arthur L. Goodhart, *Costs*, 38 Yale L.J. 849, 852-53 (1929); *Imperial Irrigation Dist.*, 595 F.2d at 532 ("It has long been recognized that prevailing parties may be awarded costs on appeal . . . ."); *Waterman S.S. Corp. v. Gay Cottons*, 419 F.2d 372, 373 (9th Cir. 1969) (applying Rule 39 to civil actions in admiralty).

[17]*See Johnson v. Pac. Lighting Land Co.*, 878 F.2d 297, 298 (9th Cir. 1989); 10 Charles Alan Wright et al., *Federal Practice and Procedure* § 2666 (3d ed. 1998 & Supp. 2009) (discussing costs under the analogous Federal Rule of Civil Procedure 54).

[18]*See* Fed. R. App. P. 39(e); *Johnson*, 878 F.2d at 298 (holding that allowable costs are limited to the items authorized in Rule 39).

[19]Fed. R. App. P. 39(e)(1), (2), (4); U.S. Court of Appeals for the Ninth Circuit, *Updated Fee Schedule Effective April 9, 2006*, http://www.ca9. uscourts.gov/datastore/general/2009/03/25/FeeSchedule0306.pdf.

"premiums paid for a supersedeas bond or other bond to preserve rights pending appeal," can be, and was in this case, huge.[20]

If this appeal were, as the majority suggests in justifying the denial of costs, primarily for the principle of the thing, Exxon need not have posted a supersedeas bond. Exxon could have pursued its appeal for no more than a few thousand dollars in record preparation expenses and filing fees, plus unrecoverable attorneys' fees.[21] But had Exxon appealed without posting a supersedeas bond, Exxon would have had to pay the plaintiffs all of the original judgment ($5 billion) in 1996, including the $4.5 billion that the Supreme Court held it did not owe. Given the practical difficulties of trying to get the money back over a decade later, at best the appeal would have generated a very expensive piece of paper saying that Exxon had overpaid by $4.5 billion.

To hold onto the money until the courts determined whether the $5 billion judgment was correct, Exxon had to secure payment of the judgment, guaranteeing that the money would be there for the plaintiffs if Exxon lost. Under Federal Rule of Civil Procedure 62(d), an appellant can stay execution of a money judgment by posting a supersedeas bond approved by the district court. Exxon obtained such a stay by posting a bond that secured the entire $5 billion judgment, plus interest.[22] Had Exxon not posted a supersedeas bond, the plaintiffs would have been entitled to take Exxon's money, all $5 billion of the punitive damages award plus interest, 10 days after the district court entered judgment in the plaintiffs' favor.[23]

---

[20]Fed. R. App. P. 39(e)(3).

[21]Fed. R. App. P. 3, 4; *see also* Fed. R. Civ. P. 62(a), (d).

[22]The supersedeas bond was amended each time the amount of the judgment changed. *See* Order Continuing Stay of Execution of Money Judgment, *In re Exxon Valdez*, No. A89-095 CIV (HRH) (D. Alaska Feb. 3, 2009) (Document No. 8969).

[23]Fed. R. Civ. P. 62(a); *United States v. $2,490.00 in U.S. Currency*, 825 F.2d 1419, 1420-21 (9th Cir. 1987).

The plaintiffs would then have been free to spend the money in the 13 intervening years as the appeals and remands dragged on.

The rationale for a supersedeas bond is that there can be no certainty about who is in the right until the appeals are done; the party that lost should not have to pay the winner until the district court's decision is finally affirmed, but in the meantime, the party that won in district court should not be at risk of the money disappearing.[24] To protect the winner from the risk that the loser will not have money if and when the judgment is affirmed, the bond is ordinarily secured by property or by surety. The surety, such as a bank or insurance company, obligates itself to pay the judgment creditor. In this case, the $5 billion judgment was secured by several banks (the judgment was apparently too big for one bank). The banks authorized an irrevocable[25] letter of credit,[26] which authorized the clerk of court to request payment of the judgment for the benefit of plaintiffs. To pay out the billions of dollars to the plaintiffs, all the clerk needed to do was sign a form saying "pay as directed in the attached order of the District Court," like endorsing a traveler's check or cashier's check.

---

[24]11 Charles Alan Wright et al., *Federal Practice and Procedure* § 2905 (2d ed. 1995 & Supp. 2009); *see, e.g.*, *Celotex Corp. v. Edwards*, 514 U.S. 300, 301-02 (1995); *Lunn v. F.W. Woodworth Co.*, 210 F.2d 159, 159-60 (9th Cir. 1954).

[25]I.e., the banks cannot withdraw from the undertaking.

[26]*Warner Bros. Int'l TV. Distrib. v. Golden Channels & Co.*, 522 F.3d 1060, 1062-63 (9th Cir. 2008) ("A letter of credit creates 'an absolute, independent obligation and payment must be made upon presentation of the proper documents regardless of any dispute between the buyer and seller concerning their agreement.' Like a Travelers Check (which is a letter of credit), it enables international business to be done safely and securely because the vendor need only rely on the financial strength of the issuing bank, and not on the financial strength and willingness to pay of the vendee." (internal citations omitted)).

Sureties do not commit their credit for free. To hold onto the $5 billion until the appeals finished, Exxon had to pay the banks $60.6 million. Exxon paid 90% percent of this money, about $54.5 million dollars, for the right to hold onto the $4.5 billion plus interest that the Supreme Court concluded Exxon did not owe. Only 10% percent, about $6.1 million, bought the right to delay paying money that Exxon turned out to owe the plaintiffs. In other words, Exxon had to spend about $6 million to secure money it did owe, and over $50 million to shield money it did not owe, while it pursued its appeals.

The Supreme Court awarded costs in favor of Exxon against the plaintiffs, even though it rendered a split decision that left the plaintiffs with up to 10% of their victory.[27] The majority does not follow the Supreme Court's determination. Instead, the majority pretends that Exxon did not win, punishes it for fighting so long and hard, and denies Exxon any costs at all. Because Exxon won 90% percent of its case and paid 90% of the $60.6 million to hold onto money it ultimately did not owe, Exxon ought to recover 90% of its allowable supersedeas bond costs. The $60.6 million was the price of Exxon's train ticket to victory. The rules, in place with little change for many centuries, say that a party that wins on appeal is entitled to have the loser reimburse the price of that train ticket.[28]

Had Exxon won the case entirely, we would still have had discretion to deny costs, because Rule 39 says "unless . . . the court orders otherwise."[29] The strong presumption in favor of awarding costs to the prevailing party would have made such an exercise of discretion unlikely.[30] When a court has discre-

---

[27]Judgment, *Exxon Shipping Co. v. Baker*, No. 07-219 (Aug. 12, 2008). The Court stated that the "maximum punitive damages award" was $507.5 million. *Exxon Shipping*, 128 S. Ct. 2605, 2615-16, 2634 (2008).

[28]Fed. R. App. P. 39(a), (e) & advisory committee's note; cf. Fed. R. Civ. P. 54(d).

[29]Fed. R. App. P. 39.

[30]*See United States v. Imperial Irrigation Dist.*, 595 F.2d 525, 530 (9th Cir. 1979); Fed. R. App. P. 39 advisory committee's note (explaining that

tion, ordinarily the question is whether the court has abused its discretion. Not infrequently this court reverse district courts for abusing their discretion. Likewise, we ourselves must not abuse our discretion. We do so here, unfortunately, by denying all costs whatsoever.

What persuades me that we are abusing our discretion is the Supreme Court's exercise of its discretion in this case. The Supreme Court awarded costs entirely in favor of Exxon, even though it left our liability decision standing on a tie vote and allowed for a half billion punitive damages award in favor of the plaintiffs on remand.[31] Just as the Supreme Court's decision binds us, its exercise of discretion should guide us. The Supreme Court concluded that Exxon prevailed to so great a degree as to deserve costs. As a lower court implementing the Supreme Court's decision on remand, we abuse our discretion by pretending otherwise.

The majority evades this obligation by arguing that there is a substantive, and not merely verbal, difference between the Supreme Court rule on costs and ours. There is not. The Supreme Court's rule says "[i]f the Court reverses or vacates a judgment, the respondent or appellee shall pay costs *unless the Court otherwise orders*."[32] Our rule says that "if a judgment is affirmed in part, reversed in part, modified, or vacated, costs are taxed *only as the court orders*."[33] From the tone of the language, one might (the majority does not) tease out a theory that the Supreme Court rule connotes a somewhat more favorable inclination toward costs than our rule, but

---

Rule 39 implements the "principle" that costs "should be borne by the unsuccessful party"); 16AA Charles Alan Wright et al., *Federal Practice and Procedure* § 3985 (4th ed. 2008 & Supp. 2009); *cf.* Fed. R. Civ. P. 54(d)(1); 10 Wright et al., supra note 17, § 2668.

[31]Judgment, *Exxon Shipping Co. v. Baker*, No. 07-219 (Aug. 12, 2008).

[32]Sup. Ct. R. 43(2) (emphasis added).

[33]Fed. R. App. P. 39(a)(4) (emphasis added).

such an inference would be too gossamer, and any attendant presumption too weak, in the face of plainly discretionary language for both courts.

For both our rule and the Supreme Court's rule, the words are discretionary, "unless the Court otherwise orders" in the Supreme Court,[34] "only as the court orders" here.[35] In substance the rules are the same, leaving costs to the court's discretion. They do so against the background of our legal system, which has, for the better part of a millennium,[36] awarded costs to prevailing plaintiffs, and for about half a millennium to whichever party prevailed.[37] As for who the prevailing party is, we have in all our decisions been much closer to plaintiffs' view of the case, but the Supreme Court disagreed and is, after all, supreme.

The Second Circuit addressed the similarity of the costs rules in its scholarly opinion, *Furman v. Cirrito*.[38] In that case, as here, the Supreme Court had reversed the court of appeals. On remand, the party that won costs in the Supreme Court under its Rule 43[39] sought them in the court of appeals under

---

[34]Sup. Ct. R. 43(2).

[35]Fed. R. App. P. 39(a)(4).

[36]See Goodhart, *supra* note 16, at 852-60.

[37]*See* Fed. R. App. P. 39 advisory committee's note; *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 606 n.8 (2001) (noting that "by the long established practice and universally recognized rule of the common law . . . the prevailing party is entitled to recover a judgment for costs" (quoting *Mansfield, Coldwater & Lake Mich. Ry. Co. v. Swan*, 111 U.S. 379, 387 (1884) (alteration omitted)); Goodhart, *supra* note 16, at 851-54; Philip M. Payne, *Costs in Common Law Actions in the Federal Courts*, 21 Va. L. Rev. 397, 403 (1935); *cf.* Fed. R. Civ. P. 54(d)(1) ("Unless . . . a court order provides otherwise, costs — other than attorney's fees — should be allowed to the prevailing party.").

[38]782 F.2d 353 (2d Cir. 1986).

[39]Sup. Ct. R. 43(2).

Rule 39.[40] *Furman* holds that despite the slight verbal differences, "[t]he language of the district, circuit, and Supreme Court rules that confer discretion to award costs is almost identical," so a Supreme Court reversal and award of costs "entitles" the victor there to costs in the court of appeals.[41] The Second Circuit explained that just as a district court on remand must follow a circuit court's decision when taxing costs, a circuit court's award of costs should be consistent with the Supreme Court's decision.[42] Since the Supreme Court reversed the Second Circuit and awarded costs under its rule to the appellants, *Furman* held that proper deference to the Supreme Court's decision meant the appellants should also be considered prevailing parties for the purposes of Rule 39, entitling them to appellate costs.[43] Because neither our rule, nor the factual circumstances before us, differ materially from those before the Supreme Court, our decision on costs should, like *Furman*, be consistent with the Supreme Court's decision. The Supreme Court awarded costs in favor of Exxon, and we abuse our discretion by defying its judgment.

The only distinction that could arguably be drawn between *Furman* and our case is that *Furman* was not a decision that left each side with something. But both our cases and those of our sister circuits have addressed what is to be done in that circumstance as well. Costs go to the "prevailing party."[44] Our

---

[40]Fed. R. App. P. 39.

[41]*Furman*, 762 F.2d at 355-56.

[42]*Id.*

[43]*Id.*

[44]*See United States v. Imperial Irrigation Dist.*, 595 F.2d 525, 530 (9th Cir. 1979); *see also Am. Auto. Mfrs. Ass'n v. Comm'r, Mass. Dep't of Envtl. Prot.*, 31 F.3d 18, 28 (1st Cir. 1994) (noting that "[p]revailing parties are normally entitled to costs" under Rule 39); *Studiengesellschaft Kohle mbH v. Eastman Kodak Co.*, 713 F.2d 128, 131-32 (5th Cir. 1983) (same); *In re Penn Cent. Transp. Co.*, 630 F.2d 183, 189 (3d Cir. 1980) (same); *Delta Air Lines, Inc. v. Civil Aeronautics Bd.*, 505 F.2d 386, 387-88 (D.C. Cir. 1974) (same).

case law holds that a party "need *not* prevail on every issue, or even on the 'central issue' in the case, to be considered the prevailing party."[45] A party "prevails" when it wins substantial relief; the amount of the cost award is determined by looking at the extent of the party's success.[46] As far as awards of appellate costs go, we have awarded costs to the party that "substantially and primarily prevailed on appeal."[47]

Likewise, the Seventh and Eighth Circuits both treat a defendant's success in substantially reducing the size of the damages award as meriting costs for amounts paid to obtain supersedeas bonds. The Eighth Circuit held in *Emmenegger v. Bull Moose Tube Co.*[48] that when the defendants succeeded in knocking several million dollars off the plaintiffs' recovery, the defendants were properly awarded costs for the premiums on a supersedeas bond they paid to shield the money while they appealed.[49] The costs defendants got in *Emmenegger*

---

[45]*Hashimoto v. Dalton*, 118 F.3d 671, 677 (9th Cir. 1997) (emphasis added and citation omitted); *Stivers v. Pierce*, 71 F.3d 732, 751 (9th Cir. 1995) ("If the plaintiff is only partially successful in seeking the relief, and achieves only some of the benefit sought by the litigation, he is still considered the prevailing party."); *see A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1029 (9th Cir. 2001) (awarding costs to party that "substantially and primarily prevailed on appeal"); 10 Wright et al., *supra* note 17, § 2667 (discussing analogous Federal Rule of Civil Procedure 54).

[46]*See Hensley v. Eckerhart*, 461 U.S. 424, 440 (1983); *see also Aguirre v. L.A. Unified Sch. Dist.*, 461 F.3d 1114, 1121 (9th Cir. 2006) (remanding for apportionment of fees in accord with party's "degree of success"); *cf. Comedy Club, Inc. v. Improv W. Assocs.*, 553 F.3d 1277, 1294 n.18 (9th Cir. 2009) (awarding costs only on the issues on which the party prevailed pursuant to an arbitration agreement which provided for the award of costs to the "prevailing party"); *Cancellier v. Federated Dep't Stores*, 672 F.2d 1312, 1320 (9th Cir. 1982) (awarding attorneys' fees on appeal to reflect party's partial success on appeal), *abrogated on other grounds*, *Gilchrist v. Jim Slemons Imps., Inc.*, 803 F.3d 1488, 1494 (9th Cir. 1986).

[47]*A&M Records*, 239 F.3d at 1029; *see also Mills ex rel. Mills v. Freeman*, 118 F.3d 727, 734-35 (11th Cir. 1997) (citing *Furman* with approval).

[48]324 F.3d 616 (8th Cir. 2003).

[49]*Id.* at 626-27.

were for the portion of the supersedeas bond securing the portion of the judgment the defendants got erased, not the whole thing.[50] We should exercise our discretion consistently with the Eighth Circuit's approach.

The Seventh Circuit in *Republic Tobacco Co. v. North Atlantic Trading Co.*[51] likewise upheld an award of costs for supersedeas bond expenses in a partial defense victory. Even though the plaintiffs wound up with $3 million out of a $18.6 million jury verdict (retaining a larger percentage of the original award than the plaintiffs in this case), the Seventh Circuit held that it was a proper exercise of discretion to tax the full costs incurred for the supersedeas bond.[52] The Seventh Circuit suggested a better exercise of discretion would be the Eighth Circuit's approach, awarding as costs the amount spent to secure the portion of the judgment vacated on appeal.[53]

The majority argues for disregarding the Seventh and Eighth Circuit cases because they speak to exercises of discretion by district courts, instead of exercises by appellate courts. But the discretionary authority of district courts, circuit courts, and the Supreme Court to award costs is conferred by rules that, as *Furman* holds, are in substance the same at all three levels.[54] We, like district courts and the Supreme Court, have a duty to exercise our discretion fairly and not abuse it. These precedents explain how that discretion may be properly exercised with regard to supersedeas bond costs and split decisions on appeal.

The D.C. Circuit exercised its own discretion, and did not merely analyze a district court's exercise of discretion, in *A*

---

[50]*Id.*

[51]481 F.3d 442 (7th Cir. 2007).

[52]*Id.* at 448-49.

[53]*Id.*

[54]782 F.2d at 355; *see* Fed. R. Civ. P. 54(d); Fed. R. App. 39; Sup. Ct. R. 43.

*Quaker Action Group v. Andrus*,[55] a case that had gone up five times on appeal and resulted in a partial victory for each side.[56] Though neither party prevailed entirely, the D.C. Circuit made cost awards under Rule 39 in favor of the "predominately prevailing party."[57] *Quaker Action* held that the plaintiffs should recover 30% of their costs for the fifth appeal and 75% of their costs for the fourth appeal.[58]

Like the Seventh and Eighth Circuits, the D.C. Circuit awarded partial costs to the partial victor. Since the D.C. Circuit exercised its own discretion to award appellate costs in a split decision, the majority is simply cavilling when it suggests that the Seventh and Eighth Circuit decisions only speak to how circuit courts should review exercises of discretion. The majority would disregard *Quaker Action Group* because it is a "thirty-year-old out-of-circuit case."[59] Indeed it is. But our legal system has no sunset provision for precedents.[60] We use decades-old and centuries-old precedents to achieve consistency over time.

The majority rejects the "mathematical" approach to supersedeas bond costs as a "thicket," and says that awarding a partial victor the percentage of its supersedeas bond costs equal to the percentage of its victory would generate "wasteful litigation."[61] The D.C. and Eighth Circuits had no trouble with arithmetic. Spending many thousands to litigate about $60.6 million is not "wasteful," and taking 90% of a number is fourth grade arithmetic. This percentage approach is no more

---

[55]559 F.2d 716 (1977) (per curiam).

[56]*Id.* at 718 n.1, 719.

[57]*Id.* at 719.

[58]*Id.*

[59]Maj. op. 7088.

[60]*See Roe v. Wade*, 410 U.S. 113 (1973); *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803).

[61]Maj. op. 7088.

complicated than calculating a tip, not much of a "thicket." Those who find it challenging could always use a calculator.

All the majority cites to support its exercise of discretion are cases in which we have not spoken to this issue at all. Every case the majority cites[62] is a split decision in which we said, "[e]ach party shall bear its own costs on appeal." Each case says that without explanation and without any indication that the costs were even disputed. None contain a holding about the apportionment of supersedeas bond expenses. None even mention Rule 39, let alone discuss when or how a court should award appellate costs under it. There are, of course, numerous split decisions in which we did the opposite and awarded costs, rather than required each party to bear their own.[63]

The problem is that majority uses these citations as decoration, as opposed to how citations are meant to be used, to assure that like cases are treated alike. We look to precedent because fairness requires that like cases be treated alike, instead of being treated differently according to how the

---

[62]*Mendez v. County of San Bernardino*, 540 F.3d 1109, 1133 (9th Cir. 2008); *Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coal. of Life Activists*, 422 F.3d 949, 967 (9th Cir. 2005); *Bains LLC v. Arco Prods. Co.*, 405 F.3d 764, 777 (9th Cir. 2005).

[63]*See, e.g.*, *McCoy v. Chase Manhattan Bank, USA*, 559 F.3d 963, 972 (9th Cir. 2009); *Nigg v. U.S. Postal Serv.*, 555 F.3d 781, 790 (9th Cir. 2009); *Merrifield v. Lockyer*, 547 F.3d 978, 992 (9th Cir. 2008); *AmerisourceBergen Corp. v. Roden*, 495 F.3d 1143, 1154 (9th Cir. 2007); *Swartz v. KPMG LLP*, 476 F.3d 756, 767 (9th Cir. 2007); *Alperin v. Vatican Bank*, 410 F.3d 532, 563 (9th Cir. 2005); *Smith v. Pac. Props. & Dev. Corp.*, 358 F.3d 1097, 1107 (9th Cir. 2004); *Theofel v. Farey-Jones*, 359 F.3d 1066, 1079 (9th Cir. 2004); *Carpinteria Valley Farms, Ltd. v. County of Santa Barbara*, 344 F.3d 822, 832 (9th Cir. 2003); *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1157 (9th Cir. 2003); *Lyons v. England*, 307 F.3d 1092, 1119 (9th Cir. 2002); *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1029 (9th Cir. 2001); *Saridakis v. United Airlines*, 166 F.3d 1272, 1279 (9th Cir. 1999); *San Pedro Hotel Co. v. City of L.A.*, 159 F.3d 470, 479 (9th Cir. 1998).

judges feel. For guidance as to how costs should be awarded in this instance, there is no more analogous precedent than the Supreme Court's award of costs in this very case. In the face of the Supreme Court's decision overturning us, the majority chooses to not award costs, even though the United States Supreme Court chose to award them, to Exxon.

The plaintiffs were victims of Exxon's malfeasance. They had to wait much too long for the punitive damages award. That wait is why they are entitled to interest.[64] But Exxon had to pay for a supersedeas bond to secure $4.5 billion it did not owe. That is why Exxon is entitled to recover that portion of its costs under Rule 39.[65] Whether we like it or not, Exxon got us overturned, and saved 90% of what the jury thought it should pay and 80% of what we thought it should pay by winning in the Supreme Court. The prevailing party has for many centuries been entitled to its costs. As for who in large part won the case in the Supreme Court, there cannot be serious doubt. The champagne corks that popped after the Supreme Court reversed us were doubtless on Exxon's side, not the plaintiffs.

---

[64]*See* 28 U.S.C. § 1961 (1994 & Supp. II 1996).

[65]Fed. R. App. P. 39(a)(4), (e).