IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

In re: )
THE EXXON VALDEZ )
_____)
　　　　　　　　　　　　　　　　　　　　)
This document relates to: )
　　　　　　　　　　　　　　　　　　　　) No. 3:89-cv-0095-HRH
　　　NAUTILUS MARINE ENTERPRISES, )
　　　M. THOMAS WATERER, and the )
　　　EXXON DEFENDANTS )
_____)

O R D E R

Motion to Lift Stay and for Entry of Judgment

Exxon Mobil Corporation and Exxon Shipping Company (referred to collectively as "Exxon" hereinafter) move[1] to lift the stay that was entered in this case in 2009 and for entry of final judgment in favor of Nautilus Marine Enterprises in the amount of $2,245,622.87 less an offset of $496,724.26 for fees and costs awarded to Exxon in state court. This motion is opposed in part and Nautilus Marine Enterprises and M. Thomas Waterer[2] (referred to collectively as "NME" hereinafter) cross-move for entry of judgment in their favor in the

---

[1]Docket No. 9804.

[2]Docket No. 9812.

amount of either $8,537,834.23 or $7,044,360.28, with no offset.[3] The cross-motion is opposed.[4] Oral argument was not requested and is not deemed necessary.

Background

On or about September 29, 2006, Exxon, NME,[5] and Cook Inlet Processing ("CIP") entered into a settlement agreement, which resolved NME's and CIP's claims[6] against Exxon for 1992 and 1993 damages arising out of the grounding of the Exxon Valdez. However, the parties were not able to agree as to the amount of prejudgment interest that should be paid on the principal amount of the settlement. Exxon contended that federal law controlled the prejudgment interest question; NME and CIP contended that Alaska law controlled the prejudgment interest question. The parties agreed that the prejudgment interest dispute would be submitted to this court for resolution.

On February 20, 2007, NME and CIP filed motions on the prejudgment interest issue.[7] After the briefing was completed on those motions, but before this court had ruled on the

---

[3]The cross-motion indicates that it is also being brought by Waterkist Corporation. However, Waterkist is not and never has been a party to this lawsuit.

[4]Docket No. 9820.

[5]Waterkist Corporation, although not a party to this action, was a party to the Settlement Agreement. Settlement Agreement between Exxon and the Nautilus Marine and Cook Inlet Processing at 4, ¶ 2.8, Exhibit 1, Affidavit of Dawn Sestito [etc.], Docket No. 9805.

[6]NME's and CIP's claims were originally filed in state court but removed by Exxon based on federal question jurisdiction.

[7]Docket Nos. 8467 and 8468.

-2-

motions, the Ninth Circuit issued a decision in the Sea Hawk Seafoods case. See In re Exxon Valdez, 484 F.3d 1098 (9th Cir. 2007). Sea Hawk was a fish processor which, like NME and CIP, had pursued claims against Exxon arising out of the grounding of the Exxon Valdez. Sea Hawk and Exxon reached a settlement as to Sea Hawk's claims but could not agree on whether federal or state law should apply to the determination of prejudgment interest. This court had ruled that federal law applied, but the Ninth Circuit reversed, holding that state law governed prejudgment interest.

After the Sea Hawk decision issued, this court called for supplemental briefing from the parties.[8] The parties agreed that pursuant to Sea Hawk, the Alaska prejudgment interest rate of 10.5 percent should be applied to them. The parties also agreed that Alaska state law provides that prejudgment interest should be simple interest, unless the parties had otherwise agreed. Exxon contended that there was no agreement between the parties as to whether prejudgment interest should be simple or compound. NME and CIP contended that the parties had agreed that prejudgment interest would be compound no matter which rate governed.

In Order No. 370,[9] this court held that NME and CIP were "entitled to prejudgment interest at a rate of 10.5% compounded annually."[10] In reaching this holding, the court focused upon the structure and text of the parties' integrated Settlement Agreement. The

---

[8] Docket No. 8502.

[9] Docket No. 8616.

[10] Id. at 15.

integrated Settlement Agreement included a proposed final judgment which provided for compounded interest, regardless of what <u>rate</u> of interest applied. After observing that the Settlement Agreement was silent about the compounding of interest issue, this court found that it was "the unequivocal statement of the agreed judgment form that the prejudgment interest should be compounded."[11]

Exxon moved for reconsideration[12] of Order No. 370 and for leave to file a Supplemental Answer to NME's complaint.[13] Exxon sought to amend its answer to include a claim for reformation of the Settlement Agreement. This court denied the motion for reconsideration and the motion for leave to supplement.[14]

After Exxon's motions for reconsideration and leave to supplement were denied, this court entered a Final Judgment.[15] On August 17, 2007, Exxon appealed Order No. 370 and the Final Judgment.

On October 17, 2007, Exxon filed a complaint in state court which alleged a single cause of action for reformation of the Settlement Agreement. On November 2, 2007, NME and CIP removed the reformation case to this court pursuant to 28 U.S.C. § 1441. Exxon moved to remand, arguing that there was no jurisdictional basis for removal. On April 22,

---

[11] Id. at 8.

[12] Docket No. 8628.

[13] Docket No. 8629.

[14] Docket No. 8635.

[15] Docket No. 8634.

2008, this court denied the motion to remand.[16] NME and CIP then moved to dismiss Exxon's complaint. On November 18, 2008, this court granted the motion to dismiss, holding that Exxon's reformation claim was barred by res judicata,[17] and a final judgment dismissing the reformation case was entered.[18]

Exxon appealed. However, before the parties had begun briefing the appeal, on March 10, 2009, the Ninth Circuit ruled on Exxon's appeal of Order No. 370 and the Final Judgment in the interpretation case. The Ninth Circuit held that this court "erred in failing to consider extrinsic evidence regarding whether the parties agreed to compound interest." In re Exxon Valdez, Case No. 07-35715, 2009 WL 605900, at *2 (9th Cir. March 10, 2009). The court of appeals also held that this court "did not abuse its discretion in denying leave to supplement the answer to add a counterclaim for reformation." Id. Thus, the court of appeals reversed in part and remanded the interpretation case to this court. Upon remand, this court vacated the Final Judgment, Order No. 370, and the portion of its July 23, 2007 order that addressed Exxon's motion for reconsideration.[19]

---

[16]Docket No. 27 in Case No. 3:07-cv-0224-HRH.

[17]Order re Motion to Dismiss at 20, Docket No. 53 in Case No. 3:07-cv-0224-HRH.

[18]Docket No. 54 in Case No. 3:07-cv-0224-HRH.

[19]Docket No. 9202.

On May 14, 2009, the Ninth Circuit vacated the judgment in the reformation case because it was based upon the Final Judgment in the interpretation case, which had been reversed in part.[20] The reformation case was remanded to this court for further proceedings.

On June 5, 2009, Exxon filed a second complaint in Alaska state court seeking a declaratory judgment interpreting the parties' rights and obligations under the Settlement Agreement, or, in the alternative, for reformation of the Settlement Agreement. NME and CIP removed the 2009 case to this court.[21] Exxon moved to remand both the original reformation case and the 2009 case to state court.[22] The court granted both motions to remand[23] and stayed the interpretation case pending the outcome of the state court cases.[24]

The state court cases were consolidated and trial was scheduled for November 2010. Shortly before the trial, CIP and Exxon reached a settlement.

NME and Exxon proceeded to trial. On March 17, 2011, the state court judge entered Findings of Fact and Conclusions of Law.[25] The state court judge

> [a]fter reviewing the written exchange of offers and counter-offers, the Letter Agreement, as well as the testimony of Mr.

---

[20]Docket No. 68 at 1 in Case No. 3:07-cv-0224-HRH.

[21]Case No. 3:09-cv-0131-HRH.

[22]Docket No. 69 in Case No. 3:07-cv-0224-HRH; Docket No. 8 in Case No. 3:09-cv-0131-HRH.

[23]Docket No. 77 in Case No. 3:07-cv-0224-HRH; Docket No. 14 in Case No. 3:09-cv-0131-HRH.

[24]Docket No. 9307.

[25]Exhibit 3, Sestito Affidavit, Docket No. 9805.

> Daum and Mr. Weidner [the two attorneys who negotiated the Settlement Agreement], ... f[ound] there is no evidence that the parties discussed and reached agreement that only compound interest would apply regardless of whether state or federal law controlled.[26]

In short, the state court judge concluded that "[a]ll of the extrinsic evidence demonstrates that the parties never agreed that interest would be compounded" and "that the proposed judgment ... was intended to provide a form of judgment that [this court] could use to implement the parties' agreement" but that "[t]he proposed judgment was not intended to include or be an agreement to pay compound interest."[27]

Judgment was entered in the consolidated state court case in Exxon's favor and Exxon was awarded attorney's fees. NME appealed the trial court's conclusion that the parties had not agreed that interest would be compound. On July 19, 2013, the Alaska Supreme Court affirmed the trial court's decision. Nautilus Marine Enterprises, Inc. v. Exxon Mobil Corp., 305 P.3d 309, 312 (Alaska 2013). NME also appealed the award of attorney's fees to Exxon. On August 22, 2014, the Alaska Supreme Court "reverse[d] the awards of attorney fees and costs and remand[ed] for a recalculation of the fees award based on local rates and for the apportionment of fees and costs" but affirmed as to "all other issues." Nautilus Marine Enterprises, Inc. v. Exxon Mobil Corp., 332 P.3d 554, 565 (Alaska 2014).

---

[26]Id. at 8, ¶ 33.

[27]Id. at 25, ¶¶ 94-95.

After the attorney's fees were re-calculated, on October 8, 2015, the state trial court entered a second revised final judgment.[28] The second revised final judgment provided:

> 1. The September 2006 settlement between Exxon ... and NME did not require Exxon to pay compound interest regardless of the applicable law. The parties intended that Judge Holland of the U.S. District Court determine both the correct rate of interest and the method of computing that interest under federal or state law.
> 2. Plaintiff Exxon's request for reformation is denied.
> 3. It is for Judge Holland to decide the appropriate law that applies, the proper interest rate, and the method of calculating that interest rate.
> 4. Exxon is awarded attorneys' fees in the amount of $340,211, expert costs in the amount of $67,500 and costs of $89,013.26 for a total award of $496,724.26.[29]

The state court proceedings having been completed, Exxon now moves to lift the stay of this case (the interpretation case) and for entry of judgment in NME's favor. NME does not oppose lifting the stay nor does NME oppose entry of judgment in its favor. However, the parties disagree as to the amount of the judgment to be entered.

Discussion

There being no disagreement between the parties, the stay is lifted.

With the stay lifted, what remains is for the court to enter judgment. In order to enter judgment, the court must determine the amount that is still owed to NME under the Settlement Agreement.

---

[28]Exhibit 4, Sestito Affidavit, Docket No. 9805.

[29]Id. at 4.

Under the Settlement Agreement, Exxon paid NME and CIP an initial settlement amount of $8,500,000.[30] This amount represented $824,601.09 for CIP's 1992 and 1993 damages and $3,726,556.16 for NME's 1992 and 1993 damages plus prejudgment interest on both of those amounts calculated at the applicable federal rate.[31] NME received $5 million of the initial settlement amount and CIP received $3.5 million.[32] Exxon also agreed to pay a Supplemental Settlement Amount, which would be "the amount, if any, that may become payable pursuant to the provisions of paragraphs 3.1, 3.2 and/or 3.3" of the Settlement Agreement.[33]

Paragraph 3.1 requires Exxon to pay the difference between prejudgment interest calculated at the federal rate and prejudgment interest calculated at whatever rate the court finds is the correct rate.[34] There is now no dispute the correct rate of prejudgment interest is the state rate of 10.5% simple. The parties agree that the difference between prejudgment interest calculated at the federal rate up to November 1, 2006 and the state rate of 10.5% simple is $3,470,716.32.[35]

---

[30]Settlement Agreement between Exxon and the Nautilus Marine and Cook Inlet Processing at 3, ¶ 2.6, Exhibit 1, Sestito Affidavit, Docket No. 9805.

[31]Id. at 3-4.

[32]Id. at 11, ¶ 5.1.

[33]Id. at 5, ¶ 2.13.

[34]Id. at 6, ¶ 3.1.

[35]NME has transposed the 1 and 6 in its briefing, but there is no disagreement that this
(continued...)

The $3,470,716.32 number is based on the report of Exxon's expert, Bruce Budge. Budge reached this number by calculating prejudgment interest at a rate of 10.5% simple on CIP's and NME's combined 1992 damages ($3,778.584.56) and on CIP's and NME's combined 1993 damages ($2,862,112.94).[36] Adding these two numbers together results in the total prejudgment interest on CIP's and NME's 1992 and 1993 damages through November 1, 2006, when calculated at 10.5% simple, being $6,640,697.50.[37] In the initial settlement amount, Exxon paid CIP and NME $3,169,981.19 in prejudgment interest.[38] The difference between $6,640,697.50 and $3,169,981.19 is $3,470,761.13.

Despite the $3,470,761.13 being based on both CIP's and NME's 1992 and 1993 damages, NME argues that it is entitled to the entire $3,470,716.32. NME argues that paragraph 3.1 is not ambiguous and that it does not provide for any allocation of any additional prejudgment interest that might become payable. NME argues that if there were confusion over how the additional prejudgment interest was to be paid, then Exxon should

---

[35](...continued)
number is based on the expert report of Bruce P. Budge. Budge's report calculated the "additional prejudgment interest due using the method in the Settlement Agreement and a rate of 10.5% simple interest [to] equal $3,470,716.31[.]" Expert Report of Bruce P. Budge at 4, Exhibit 11, Declaration of Edward P. Weigelt, Jr., Docket No. 9813. Exxon has raised a number of objections to the averments in Mr. Weigelt's declaration, which is filled with improper legal argument and improper opinions. However, Exxon raised no objections to the exhibits attached to Mr. Weigelt's declaration.

[36]Budge Expert Report at 3, Exhibit 11, Weigelt Declaration, Docket No. 9813.

[37]Id.

[38]Id. at 4.

have moved to reform paragraph 3.1, which it did not do. NME contends that Exxon has never claimed that the language of paragraph 3.1 is vague or ambiguous. NME argues that Exxon is relying on a subrogation theory to attempt to modify its obligations under the Settlement Agreement and that such an attempt should fail. NME contends that Exxon's status in this case is that of a debtor which had an obligation to pay NME and CIP and thus any monies that Exxon paid to CIP were in payment of Exxon's own obligations to CIP and not payments of NME debts.[39] NME insists that any claim of allocation is between NME and CIP, not NME and Exxon. NME insists that there is simply no contract provision that would allow modification of Exxon's liability under paragraph 3.1 due to a settlement with one party to the Agreement.

NME is not entitled to the entire $3,470,716.32. Paragraph 5.1 of the Settlement Agreement provides that "[a]ny Supplemental Settlement Amount shall be paid pursuant to further written instructions from Seafood Processors Counsel, Counsel for NMI, Tom Waterer, and Mike Shupe [CIP's president]."[40] That both CIP and NME had to provide payment instructions as to any Supplemental Settlement Amount is a clear indication that any Supplemental Settlement Amount was to be allocated between CIP and NME.

---

[39]NME's position that it is entitled to the entire $3,470,716.32 seems to be driven in large part by the fact that it does not know the details of CIP's settlement with Exxon. NME repeatedly refers to this as a "secret" settlement.

[40]Settlement Agreement between Exxon and the Nautilus Marine and Cook Inlet Processing at 11, ¶ 5.1, Exhibit 1, Sestito Affidavit, Docket No. 9805.

The Settlement Agreement is silent, however, as to how such an allocation should be made. When faced with such a situation, the Alaska Supreme Court looks to Section 204 of the <u>Restatement (Second) of Contracts</u>. "Under section 204..., '[w]hen the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court.'" <u>Disotell v. Stiltner</u>, 100 P.3d 890, 896 (Alaska 2004).

Exxon argues that it would be reasonable for the court to apply the same allocation formula the parties agreed to at the time of the settlement, which was that NME received 58.82% of the initial settlement amount and CIP received 41.18%. Under that allocation scenario, NME would be entitled to recover $2,041,475.34 in additional prejudgment interest.

But, NME has offered evidence that the payment instructions for the initial settlement amount were "based on other business relations between [CIP and NME], including loans and joint fish processing agreements, and also a joint prosecution agreement which included sharing the initial settlement proceeds"[41] and that "[t]he joint prosecution agreement and sharing obligations between CIP and the other parties were terminated shortly after the

---

[41]Weigelt Declaration at 4, ¶ 6, Docket No. 9813.

settlement."[42] In light of this evidence, it would not be reasonable to allocate the Supplemental Settlement Amount based on how the initial settlement amount was allocated.

It would, however, be reasonable to allocate the additional prejudgment interest based on NME's actual damages. During the negotiations that led to the Settlement Agreement, the parties' lawyers signed what became known as the "Letter Agreement" which "[t]hey intended ... to 'constitute an agreement' to settle the case" and which the state court judge found was "binding between NME and Exxon."[43] In the Letter Agreement, Exxon expressly

> agree[d] to pay CIP ... $710,750.06 on account of damages accrued in 1992 and NMI ... $1,797,859.50 on account of damages accrued in 1992, and to pay CIP $113,851.03 on account of damages accrued in 1993, and NMI $1,928,969.65 on account of damages accrued in 1993, <u>together with pre-judgment interest on those sums as provided by law</u>[.[44]]

In short, Exxon agreed to pay NME prejudgment interest on the damages that NME actually incurred. Exxon's expert has calculated that NME is entitled to $2,864,009.24[45] in additional prejudgment interest based on its 1992 and 1993 damages. Thus, the court finds that NME is entitled to recover $2,864,009.24 of the $3,470,716.32 in additional prejudgment interest that has become payable pursuant to paragraph 3.1 of the Settlement Agreement.

---

[42]Id.

[43]Findings of Fact and Conclusions of Law at 8, ¶ 31, Exhibit 3, Sestito Affidavit, Docket No. 9805.

[44]Letter Agreement at 1, Exhibit 3, Weigelt Declaration, Docket No. 9813 (emphasis added).

[45]Budge Report at 4, Exhibit 11, Weigelt Declaration, Docket No. 9813.

NME argues, however, that this is not the only amount that has become payable. NME argues that it is also entitled to interest from November 1, 2006 to the present on whatever portion of the $3,470,716.32 is allocated to it. NME argues that the $3,470,716.32 represents the "balance" of NME's economic damages arising from the oil spill and thus it is entitled to prejudgment interest on these damages. NME contends that interest is a consequential economic damage and that under the Settlement Agreement, Exxon still owes NME its unpaid economic damages. NME argues that it is entitled to prejudgment interest on its portion of the $3,470,716.32 in order to be made "whole". NME points out that prejudgment interest is intended to compensate for the "loss of use of money" that a plaintiff "actually suffers ... between accrual of his claim and judgment[.]" State v. Phillips, 470 P.2d 266, 273 n.27 (Alaska 1970). Here, NME argues that it has lost the use of its portion of the $3,470,716.32 for almost ten years and thus it insists that it is entitled to prejudgment interest on whatever additional prejudgment interest Exxon owes under paragraph 3.1. NME points out that under Alaska law "[i]t is only when ... an award" of prejudgment interest "would do an injustice that it should be denied" and that "[t]he only ground for denial [the Alaska Supreme Court has] so far recognized has been double recovery." Farnsworth v. Steiner, 638 P.2d 181, 184 (Alaska 1981). As the court in Farnsworth noted, "[t]he real question in awarding interest to a judgment creditor is whether the debtor has had use of money for a period of time when the creditor was actually entitled to it." Id. Here, NME argues that there can be no dispute that Exxon had the use of the $3,470,716.32 from November 1, 2006 until

now, a period of time during which NME was actually entitled to a portion of that money. NME contends that Exxon could have paid the additional money after the Sea Hawk decision made it clear that state law would govern the interest issue and thus avoided having to pay prejudgment interest from November 1, 2006 to the present, as Exxon's counsel recommended.[46] But because Exxon made a business decision to further delay payment and continue to use the money until now, NME argues that Exxon must live with that choice now and pay post-November 1, 2006 prejudgment interest.

NME's argument ignores the express terms of the Settlement Agreement. Paragraph 3.1 of the Settlement Agreement provides:

> The period for which interest shall be payable on the sum of $2,508,609.56 shall commence on July 1, 1992, and continue through November 1, 2006, or the date the Court enters judgment, whichever is earlier. The period for which interest shall be payable on the sum of $2,042,547.68 shall commence on July 1, 1993, and continue through November 1, 2006, or the date on which the Court enters judgment, whichever is earlier.[47]

There is nothing ambiguous about this provision. It plainly provides that the accrual of prejudgment interest stops on November 1, 2006. NME has long been aware that this is what the Settlement Agreement provided. During oral argument before this court in July 2007, NME's attorney, Mr. Weidner, stated that Exxon "bargained for and got an agreement

---

[46]SEALED Exhibit 15 at 3, Docket No. 9833.

[47]Settlement Agreement between Exxon and the Nautilus Marine and Cook Inlet Processing at 6, ¶ 3.1, Exhibit 1, Sestito Affidavit, Docket No. 9805.

that the interest would stop last November, that's about seven months ago, because under state law the interest goes all the way until the judgment."[48] Mr. Weidner further stated that

> we're not asking for any more prejudgment interest than we agreed to in the settlement. We're not saying, hey, wait a minute, go back and start the accrual a couple months extra or it's been seven months because we thought the judge was going to rule by then, give us the seven months. A deal's a deal and we're sticking with it.[49]

In addition, in the proposed final judgment that NME submitted to the court on July 20, 2007, NME calculated prejudgment interest as accruing only through November 1, 2006.[50] NME's contention that the parties to the Settlement Agreement did not intend there to be a "gap" period is unavailing. While the parties may not have foreseen that it would take almost ten years to resolve their prejudgment interest dispute, the parties expressly agreed that prejudgment interest would stop accruing on November 1, 2006. NME is not entitled to post-November 1, 2006 prejudgment interest.

As set out above, the Supplemental Settlement Amount is also to include any amounts that became payable under paragraph 3.2, which governs the issue of attorney's fees. The parties agree that NME is entitled to attorney's fees in the amount of 10% of whatever the court ultimately decides NME is owed under paragraph 3.1. NME is entitled to

---

[48]Transcript of Oral Argument at 37:6-9, Exhibit 5, Sestito Affidavit, Docket No. 9805.

[49]Id. at 41:14-18.

[50]Exhibit A at 2, Notice of Filing Conforming Proposed Final Judgment Re: Order Number. 370, Docket No. 8625.

$2,864,009.24 in additional interest pursuant to paragraph 3.1, which means that NME is entitled to $286,400.92 in attorney's fees pursuant to paragraph 3.2.

Finally, Exxon argues that it is entitled to an off-set of $496,724.26 in fees and costs awarded in the state court action plus post-judgment interest on that amount. NME, however, argues that an off-set would not be appropriate because Exxon's obligations are to Nautilus Marine Enterprises, Mr. Waterer, and Waterkist Corporation but only Nautilus Marine Enterprises owes Exxon money pursuant to the state court judgment.

The court finds that an off-set would be appropriate here. Exxon has no obligation to Waterkist Corporation because as noted above, Waterkist Corporation is not now and never has been a party to this lawsuit. As for Mr. Waterer, Exxon has submitted evidence that Mr. Waterer is the president and general manager of Nautilus Marine, that his job responsibilities were "everything relating to the operations, financing and sales of the corporation", that he owns 100% of the shares of Nautilus Marine, that he and his wife are Nautilus Marine's officers and directors but that his wife is not very involved in the business, that he was Nautilus Marine's only live witness in the state court trial, that he attended seven depositions that were taken in that matter, and that he telephonically attended four of the state court hearings.[51] Given this unrefuted evidence, the court finds that Mr. Waterer is in privity with

---

[51] Exhibits 7, 8, and 9, Sestito Reply Affidavit, Docket No. 9821; SEALED Exhibit 5, Docket No. 9825.

Nautilus Marine such that an off-set would be appropriate even though Mr. Waterer was not a party to the state court action.

Conclusion

The motion to lift the stay and for entry of judgment is granted. Judgment shall be entered in favor of Nautilus Marine Enterprises and M. Thomas Waterer in the amount of $3,150,410.16 ($2,864,009.24 in additional prejudgment interest plus $286,400.92 in attorney's fees) with an off-set $496,724.26.

DATED at Anchorage, Alaska, this 28th day of November, 2016.

/s/ H. Russel Holland
United States District Judge